**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ANA GARCIA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO: |
| v. | § | |
| | § | 4:23-cv-04366 |
| HARRIS COUNTY, TEXAS, | § | |
| | § | |
| *Defendant.* | § | Jury Requested |

## <u>ORIGINAL COMPLAINT AND JURY DEMAND</u>

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Plaintiff **ANA GARCIA** (hereinafter referred to as the "Plaintiff"), individually, as heir, and as representative of **KEVIN ALEXANDER SANCHEZ-TREJO** (hereinafter referred to as the "Decedent"), and files this Original Complaint against Defendant **HARRIS COUNTY, TEXAS** (hereinafter referred to as "Harris County," or "Defendant" or the "County"). In support of such, Plaintiff would show the Court as follows:

[CONTINUED NEXT PAGE]

## I.    TABLE OF CONTENTS

I.    TABLE OF CONTENTS ............................................................................. 2

II.   STATEMENT OF THE CASE ................................................................... 3

III.  JURISDICTION AND VENUE ................................................................. 3

IV.   PARTIES ................................................................................................... 4

V.    RELEVANT BACKGROUND .................................................................. 4

    A.    THE DECEDENT'S INCIDENT ............................................. 4

    B.    PRE-SUIT DISCOVERY EFFORTS ....................................... 8

VI.   CAUSES OF ACTION .............................................................................. 9

  COUNT 1 – *MONELL* PATTERN-OR-PRACTICE ................................... 9

    A.    THE POLICY OR CUSTOM ................................................... 9

    B.    THE POLICYMAKERS KNEW OR SHOULD HAVE KNOWN ............... 11

        i.    THE TEXAS ADMINISTRATIVE CODE ......................... 12

        ii.   THE DEPARTMENT OF JUSTICE REPORT ................... 14

        iii.  TEXAS COMMISSION ON JAIL STANDARDS REPORTS ........... 16

        iv.   LAWSUITS AND SETTLEMENTS ................................... 24

        v.    PUBLIC STATEMENTS OF THE POLICYMAKERS .......... 24

        vi.   SUBSEQUENT EVENTS ALSO SHOW DISPOSITION ..... 27

    C.    CONSTITUTIONAL VIOLATION AND MOVING FORCE ............ 29

        i.    THE CONSTITUTIONAL VIOLATION ........................... 29

        ii.   MOVING FORCE ............................................................. 31

        iii.  PATTERN OF INCIDENTS ............................................... 31

  COUNT 2 – FAILURE TO SUPERVISE ..................................................... 67

  COUNT 3 – FAILURE TO TRAIN ............................................................. 69

  COUNT 4 – EPISODIC ACTS .................................................................... 71

  COUNT 5 – SURVIVORSHIP ................................................................... 72

  COUNT 6 – WRONGFUL DEATH ............................................................ 73

VII.  ADOPTION BY REFERENCE OF RELATED CIVIL ACTION ........... 74

VIII. ATTORNEY'S FEES ............................................................................... 74

IX.   JURY REQUEST ..................................................................................... 74

X.    DAMAGES .............................................................................................. 75

XI.   PRAYER .................................................................................................. 75

2

## II.    STATEMENT OF THE CASE

1.    The Plaintiff is seeking to impose municipal liability claims against Harris County, pursuant to *Monell v. Department of Soc. Svcs*., 436 U.S. 658 (1978), stating pattern-or-practice claims as well as failure-to-train and failure-to-supervise claims.  These are the same kind of claims brought against Harris County by the named plaintiffs in the related Civil Action No. 4:23-CV-02886 (namely, the claimants in that related case are: Octevia Wagner, Gabrielle Smith, Dwanna Johnson, Jacilet Griffin-Lee, Timothy Lee, Tammy Peterson, Phillip Vallaire, Annette James, Shannon Piro, Dolores Smith, Jaquez Moore, Amanda Harris, Taylor Euell, Christopher Young, John Coote, Harrell Veal, Ryan Twedt, Jeremiah Anglin, Kenneth Richard, Zachary Zepeda, Dylan Perio, Dianne Bailey Rijsenburg, Zachery Johnson, Antonio Radcliffe, Jeremy Garrison, Tracy Woodson-Smith And Kevin Smith, Sr.).  Hereinafter, the Civil Action No. 4:23-CV-02886 will be referred to herein as the "Related Civil Action."  The complaint of the Related Civil Action exposes the Defendant's extensive and abusive civil rights violations against numerous inmates of the Harris County Jail in recent years.  It is no coincidence that the Decedent (Kevin Sanchez-Trejo) is also mentioned in the complaint of the Related Civil Action since he was an inmate who suffered damages and died while under the care of the Harris County jail officials.  His mother, the Plaintiff here, is seeking to impose liability on Defendant and compensation for damages, and doing so both individually, as heir, and as representative of the Decedent.

## III.    JURISDICTION AND VENUE

2.    This action is brought pursuant to 42 U.S.C. §1983 and §1988 and the Fourth Amendment to the United States Constitution, made applicable to the Defendants through the Fourteenth Amendment to the United States Constitution.  This Court thus has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.  Venue is proper

in this Court pursuant to § 1391(b) because the incident in question took place in Harris County, Texas, within the Southern District of Texas.

## IV.    PARTIES

3.    Plaintiff Ana Garcia is the mother and heir of the Decedent Kevin Alexander Sanchez-Trejo, and represents the remaining heirs in this Complaint.  Ms. Garcia is currently a resident of North Carolina.

4.    Defendant Harris County is the government entity responsible for the Harris County Sheriff's Office which is, in turn, responsible for the administration of the Harris County Jail where the Plaintiff and the Decedents suffered their injuries.  Harris County is located in the Southern District of Texas.

## V.    RELEVANT BACKGROUND

### A.    THE DECEDENT'S INCIDENT

5.     The claims stated in this civil action arise out of the same or similar series of transitions and occurrences, and involve similar significant questions of law and fact, common to all parties in the Related Civil Action.  *See* Related Civil Action, Doc. 1, Pg. 13 ¶ 43.  Among the pattern of incidents pled in the complaint of the Related Civil Action was that tragic incidents that lead to the death of the Decedent, while he was in the care and custody of the Defendant.  *See* Related Civil Action, Doc. 1, Pg. 130-131 ¶ 793-799.  To further add color, context and substance to the facts pled in said Related Civil Action, the Plaintiff hereby further alleges and states the following additional facts.

6.    On or around November 21, 2021, the 21-year-old Decedent was booked into the Harris County Jail.  Upon information and belief, at that time, the Defendant failed to adequately and sufficiently conduct a medical screening of the Decedent.

7.      The next day, on or around November 22, 2021, the Honorable 230th District Court of Texas, Harris County, found probable cause for the further detention of the Decedent, and ordered that the Decedent be committed to the custody of the Sherriff of Harris County, until he posted the require bond or until there were further orders of the court.

8.      The Decedent, however, was indigent and could not afford to post bond.  In fact, on or around November 29, 2021, the Honorable 230th District Court of Texas, Harris County, found that the Decedent was indigent and appointed him an attorney.

9.      In addition, the Honorable 230th District Court of Texas, Harris County, ordered that the Decedent be arraigned on January 18, 2022 at 9:00 AM.

10.      At that time, however, Decedent's criminal case was reset for March 22, 2022.  But unfortunately, the Decedent would not live to see that date.

11.      Upon information and belief, between the date of his booking, on or around November 21, 2021 up to February 12, 2022 (*i.e.*, for eighty plus (80+) days), the Decedent suffered each day from a serious medical need, and the Defendant had notice of it, but did little, if anything at all, to medically assist him, and allowed him to suffer in pain.

12.      Upon information and belief that serious medical situation were painful kidney stones, or something similar in nature, which caused the Decedent unbearable pain; and, had Defendant actually provided basic and adequate medical care to the Decedent, more information regarding the precise nature of his condition would be known to the Plaintiff.

13.      In any case, during those eighty plus (80+) days, the Decedent would repeatedly put the Defendant on notice of the unbearable and serious abdominal pain he was experiencing, and based on information and belief the Defendant provided minimal, if any at all, medical

assistance to him, which ultimately would have been significantly below the standard of medical care the Decedent needed.

14. During which time, the Decedent would also repeatedly call the Plaintiff (*i.e.*, his mother) on the telephone to complain that he had repeatedly put the Defendant on notice about his medical needs; still, based on information and belief, the county jail staff was refusing to provide him with adequate and necessary medical attention.

15. Based on information and belief, Defendant allowed Decedent to continue to suffer in pain day after day, and so Decedent felt so desperate for relief that he had no other choice but to seek pain relief otherwise, using alternative medical resources made available to him by other inmates. The Decedent was becoming increasingly desperate as his pain had become unbearable. His mental health and wellbeing were also deteriorating, based on conversations with his mother, the Plaintiff. Decedent took pain killers on his own in order to survive the pain and suffering he was experiencing as a result of inadequate medical attention received in the county jail.

16. Upon information and belief, Defendant has a common and well-settled custom, policy or practice of not fully or adequately screening its all of its jail staff employees; and, due to this custom, policy or practice, and repeated failures by the county to enforce adequate security measures and jail entry procedures, or failure to apply the effective security standards to all of its employees, in equal measure, Defendant has allowed illicit drugs and other related contraband to circulate among the inmate population housed in the county jails. Stated otherwise, these dangerous county jail administration customs, policies and practices have allowed illicit drugs to enter the prison system and reach the inmates, which is in significant part the cause of the injuries suffered by the Decedent.

17.     On or around February 12, 2022, and based on information and belief, the Decedent spent his last few hours alive on this Earth enduring a slow, agonizing death as his body began to shut down.  Unable to stand or speak coherently, the Decedent twitched, thrashed, convulsed, and repeated cried out for help, but help never came.

18.     The Defendant has a common and well-settled custom, policy or practice of ignoring jail inmates' repeated cries and pleas for urgent medical assistance, which causes constitutional injuries to county inmates, and which, in this particular case, based on information and belief, caused the damages and death to the Decedent.

19.     By the time the Defendant jail staff bothered to check on the Decedent, the staff noticed the Decedent was already unresponsive in his bed and had died. Based on information and belief, Decedent suffered an agonizing death.

20.     Before then, however, the Defendant had failed to properly observe and monitor the Decedent and conduct proper face-to-face observations.  Which means that the Defendant had failed to provide the Decedent with adequate medical care in a timely manner, causing damages to the Decedent for violation of his constitutional rights.

21.     Adding further, Defendant had a common and well-settled custom, policy or practice of inadequate supervision that permitted the distribution and use of illicit drugs within the jail which in the recent decade has become a significant pattern within the jail, and in this particular case, based on information and belief, was a moving force behind the Decedent's constitutional rights' violations, damages and death.

22.     Moreover, Defendant also had custom, policy or practice of not providing proper and adequate supervision of the prisoners.  To that point, proper observation through face-to-face

and cameras would have given the Defendant sufficient time to notice the distribution and ingestion of the illicit drugs and to notice that the Decedent had become unresponsive.

23. The Defendant's rampant practice and policies of allowing the common and well-settled problems of jail understaffing and inmate overcrowding in the jail impeded the Decedent's access to timely and adequate medical care. Based on information and belief, at the time of Decedent suffering damages and his death, the Defendant did not have sufficient staff to administer needed medications to inmates needing them; this resulted in jail medications either not being issued on time (or at all), or certain sick detainees being skipped by overworked and indifferent jail officers; and further resulted in having staff fail to properly document, screen, and/or follow-up with inmates that had well-known medical issues; and further resulted in failing to properly observe the use and distribution of drugs amongst detainees in the county jail; and also resulted in the failure to have sufficient medical staff to be able to perform full examinations and testing on the detainees; and finally resulted in jailer's reduced ability to properly observe the sick inmates and provide them with sufficient medical care, which in this case caused injury to the Decedent, and led to his death.

**B.    PRE-SUIT DISCOVERY EFFORTS**

24. On April 19, 2023, the Plaintiff served upon the Defendant a Public Information Request seeking grievance, disciplinary, commissary, surveillance videos, medical records, and any document or records related to his death.

25. On May 10, 2023, the Defendant withheld the same on grounds that litigation regarding "the in-custody death of the [Decedent was] reasonably anticipated."

26. The Plaintiff has acted diligently in attempting to obtain more detailed information regarding the Decedent's medical care and the violation of his constitutional rights, but has been

8

impeded by the Defendant's efforts to block such disclosure. Thus, Plaintiff has had no other choice but to seek recourse against the Defendant in this federal court.

## VI.    CAUSES OF ACTION

**COUNT 1 – _MONELL_ PATTERN-OR-PRACTICE**

27.    Plaintiff fully incorporates the foregoing and succeeding paragraphs as if set forth herein.

28.    A county may be directly liable under _Monell v. Dep't of Soc. Servs._, 436 U.S. 658 (1978).  For such, Plaintiff need only show (A) an official policy or custom, (B) that a policymaker can be charged with actual or constructive knowledge, and (C) a constitutional violation whose moving force is that policy or custom.[1]

### A.    THE POLICY OR CUSTOM

29.    As a general matter, there are at least three ways to establish an official policy under _Monell_: (1) written policy statements, ordinances, or regulations, (2) a widespread practice that is so common and well-settled as to constitute a custom that fairly represents policy, or (3) even a single decision may constitute municipal policy where the official or entity possessing final policymaking authority for an action performed the specific act that forms the basis of the § 1983 claim.  _St. Maron Props., L.L.C. v. City of Houston_, 2023 U.S. App. LEXIS 22044 *7 (5th Cir. 2023); _see also Bartee v. Harris Cty._, 2018 U.S. Dist. LEXIS 232945 *8 (S.D. Tex. 2018) (noting the first two).  Here, upon information and belief, the county jail administration has written policy statements, common and well-settled widespread practices, and/or single decisions by

---

[1] _Moore v. LaSalle Mgmt. Co._, 41 F.4th 493, 509 (5th Cir. 2022); _Bishop v. Arcuri_, 674 F.3d 456, 467 (5th Cir. 2012); _see also Bartee v. Harris Cty._, 2018 U.S. Dist. LEXIS 232945 *7-8 (S.D. Tex. 2018); _Releford v. City of Houston_, 2016 U.S. Dist. LEXIS 167749 *9 (S.D. Tex. 2016) (Ellison, K.).

policymakers within the administration that results in constitutional rights violations.  In all, based on information and belief, they show the following:

30.   ***Failure to Observe and Monitor***:   The Defendant has a custom, policy or practice of failing to routinely properly observe and monitor detainees through face-to-face checks, video monitoring, and of failing to identify and monitor well-known "blind spots" within the jails' physical premises, and in failing to accurately report and document any of those observations, in such a way that results in constitutional rights violations of the inmates housed in such premises.

31.   ***Failure to Provide Medical Care***:   Defendant has a custom, policy or practice of failing to provide detainees with medical care and/or sufficient medical care in a timely manner (or at all); and/or failing to provide medications to detainees; and/or failing to follow medical instructions from physicians; and/or failing to properly document health concerns or the true medical needs of detainees; and/or failing to properly evaluate and test detainees who have well-known illnesses or injuries in a reckless disregard of the known consequences of failing to test and diagnose illnesses, injuries and medical conditions; and/or failing to transfer detainees with-known or knowable medical conditions to a higher care facilities or detention facility that could provide adequate acute and chronic care for the detainees' disabilities and medical conditions.

32.   ***Systemic Understaffing and Overcrowding***: The Defendant has a custom, policy or practice of routinely understaffing and overcrowding of the county jails in such a way that it impedes detainees' access to adequate medical care, reduces the staff's ability to supervise detainees in a safe manner, reduces the staff's abilities to conduct face-to-face observations, and increases the likelihood of harm suffered by the detainees.

33.   ***Disparte Staff Scrutiny / Security Screenings***.   The Defendant does not provide all of its staff members with the same level of scrutiny, nor apply the same level of security

screenings to all of its jail staff members who enter the jail facilities.[2]  This, even though all staff members should be under the same rules and have the same level of scrutiny.  Because of this custom, parts of Defendant's jail staff are able to bring drugs like fentanyl and heroin into the facility and sell or distribute it.

34.     ***Housing Detainees Far Away and Outside the County***:  The Defendant has long had a custom, policy or practice, written documents containing policy statements, and common and a well-settled practice, and/or clearly expressed decisions by policymakers within the county, of routinely transferring inmates to physical facilities outside of the county, and even outside of the State of Texas, where the inmates suffer from inadequate supervision, security, and critical constitutional rights violations, and where inmates are not medically cared for in a way that prevents them from suffering from violations of their constitutional rights, injuries or death.

**B.     THE POLICYMAKERS KNEW OR SHOULD HAVE KNOWN**

35.     Under *Monell*'s second element, Plaintiff need only show that a policymaker actually or constructively knew of the custom.  *Moore v. LaSalle Management*, No. 20-30739 (5th Cir. July 22, 2022) at Pg. 23 ¶ 1.  A policymaker is an individual or individuals who takes the place of the governing body in a designated area of government administration.  *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d (5th Cir. 2010).  Here, that would be either the Defendant's Sherriff or its Commissioner's Court.  Upon the former, the Harris County Sheriff is the policymaker for the Defendant with regards to both the Harris County Jail and the employees of the Sheriff's

---

[2] According to Cynthia Cole, the executive director of a Houston Chapter of AFSCME, a local union that represents forty percent (40%) of the workers inside the Harris County Jail. *See* "Fentanyl-Related Deaths in Harris County Spark Demand for Outside Investigation." Houston Public Media, 2023-01-06, Author: Lucio Vasquez, accessed at https://www.houstonpublicmedia.org/articles/news/criminal-justice/2023/01/06/440645/fentanyl-related-deaths-in-harris-county-jail-spark-demand-for-outside-investigation/

Office.   *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *9 (S.D. Tex. 2018).   As background, in Texas, sheriffs "have indisputable wide-ranging discretion in the selection of their employees." *Garcia v. Reeves County*, 32 F.3d 200, 203 (5th Cir. 1994).   Among which, a sheriff may, with the approval of the Commissioners Court employ a sufficient number of guards to ensure the security of a jail. *See* Tex. Gov't Code § 85.005.   Moreover, deputies serve at the pleasure of the sheriff. *See* Tex. Gov't Code § 85.003(c).   Thus, either or both the Sheriff and/or the Commissioner's Court are the relevant policymakers for the purposes of *Monell*'s second element. And, here, through various laws, reports, notices of non-compliance, public debates, incidents, lawsuits, settlements, new stories, and internal documentation, Defendant's Sheriff and Commissioner's Court knew of the pattern-or-practice at issue in this lawsuit.

### i.     THE TEXAS ADMINISTRATIVE CODE

36.     The first source of notice is Texas law.   Among the mandatory requirements for the treatment of inmates, state law mandates that Defendant's policymaker have a health services plan which provides for medical services by licensed physicians, professionals, allied health personnel,[3] hospital, or similar services. *See* Tex. Admin. Code § 273.1.   Said plan must specifically comply with the following, in relevant part:

(1) provide for regularly scheduled sick calls,

(2) provide referrals for medical services,

(3) provide for procedures for efficient and prompt care for acute and emergency situations…

(7) provide for procedures for the distribution of prescriptions,

---

[3] Allied Health Personnel are licensed health professionals that are involved with the delivery of health-related services pertaining to the identification, evaluation, and prevention of diseases and disorders, dietary and nutrition services, and rehabilitation and health systems management. *See* Tex. Admin Code § 253.1(2).

12

(8) provide procedures for the control and distribution of over-the-counter medications…

(10) provide procedures for all examinations, treatments, and other procedures to be performed in a reasonable and dignified manner and place,

(11) provide that adequate first aid equipment and patient evacuation equipment be on hand at all times,

(12) provide procedures that shall require that a qualified medical professional review prescription medication an inmate is taking when taken into custody…

(14) provide procedures to give inmates the ability to access a health professional at the jail or through telehealth service 24 hours a day or, if a health professional is unavailable at the jail or through telehealth service, provide for a prisoner to be transported to access of a health professional.

*See* Tex. Admin. Code § 273.1(1-3), (7-8), (10-12) and (14).

37.    Moreover, Texas law has also put Defendant's policymakers on notice that all medical instructions of designated physician were to be followed. *See* Tex. Admin. Code § 273.3. And Texas law also put Defendant's policymakers on notice that there needed to be procedures for the maintenance of a separate health record on each inmate, and that that record should include a health screening procedure administered by health personnel or by a trained booking officer upon the admission of an inmate to a facility which covered health histories and current illnesses and prescriptions. *See* Tex. Admin. Code § 273.3(a).

38.    In addition to a required health policy, Defendant's policymaker was also on notice of certain supervision requirements. Among those, first, every jail facility is required to have an appropriate number of jailers at the facility twenty-four (24) hours each day, and shall have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every sixty (60) minutes. *See* Tex. Admin. Code § 275.1. But for inmates known to be assaultive, potentially suicidal, mentally ill, or who have demonstrated bizarre behavior, observation is to be performed at least every thirty (30) minutes. *Id*. Moreover, Defendant was

13

required to have two-way voice communication capability between inmates and jailers, and closed-circuit television may be used, *but not in lieu of the required personal observation*. *Id*. Additionally, Defendant was required to have the inmates be supervised by an adequate number of jailers. *See* Tex. Admin. Code § 275.4. One jailer was required to be on each floor of the facility where ten (10) or more inmates were housed, with no less than one (1) jailer per forty-eight (48) inmates or in an increment thereof on each floor for direct inmate supervision. *Id*. And, for the protection of the inmates, any items brought into the security perimeter, were required to be searched for contraband, and there should be regular and irregular searches of the entire facility for contraband noted in the permanent facility record. *See* Tex. Admin. Code § 275.4.

### ii.    THE DEPARTMENT OF JUSTICE REPORT

39.    In addition to the Texas Administrative Code, the U.S. Department of Justice also put Defendant's policymakers on notice. As background, the deplorable conditions and nature of Defendant's jail grew to such a degree that the U.S. Department of Justice (hereinafter referred to as the "DOJ") was forced to investigate the Defendant for constitutional violations beginning back in March 2008. *See* Related Civil Action, Doc. 1, Pg. 51 ¶ 274. After which, the DOJ concluded:

> "[C]ertain conditions at the Jail violate the constitutional rights of detainees. Indeed, the number of inmate deaths related to inadequate medical care, described below, is alarming. As detailed below, we find that the Jail fails to provide detainees with adequate: (1) medical care; (2) mental health care; (3) protection from serious physical harm; and (4) protection from life safety hazards."

*See* Related Civil Action, Doc. 1, Pg. 51 ¶ 271 (quoting a June 4, 2009 DOJ Report).

In regard to medical care, the DOJ found significant deficiencies in multiple areas and explicitly put Defendant on notice of the following:

> "[T]he Jail fails to provide consistent and adequate care for detainees with serious chronic medical conditions. These deficiencies, in themselves and when combined with the problems in medical record-keeping and quality assurance discussed below, **are serious enough to place detainees at an unacceptable risk of death or injury**."

*See* Related Civil Action, Doc. 1, Pg. 51 ¶ 277 (quoting a June 4, 2009 DOJ Report) (emphasis added).

40.    Specifically, "Because of crowding, administrative weakness, and resources limits, the Jail does not provide constitutionally adequate [medical] care to meet the serious [medical] needs of detainees." *Id*. ¶ 278.  Moreover, the DOJ also put the Defendant on notice that physicians and nurses routinely filled-out paperwork incorrectly stating that evaluations were done when they were in fact not even completed.  *Id*., Pg. 52 ¶ 279.  Moreover, the DOJ also put Defendant on notice that there were problems with "chronic care assessments" and "in the assessment of detainees receiving medications." *Id*. ¶ 280.  That medications were not properly monitored, were not routinely given out, dosages were provided in varying levels with potentially fatal combinations, and the effects of the medication were not followed-up with.  *Id*.

41.    Additionally, the DOJ also put Defendant on notice that the Defendant's clinic was but a "makeshift emergency room" insufficient to meet the needs of thousands of detainees within the jail. *Id*. ¶ 281.  That the process for requesting care was insufficient "due to crowding, staffing limits, and some problematics practices." *Id*.  And, that some of these practices included having inadequate oversight for detainee requests for medical care *and significant delays in responding to medical requests*. *Id*.  That the Defendant had a trend of deleting medical requests after being processed so no confirmation or follow-up to confirm that the medical issue had been resolved. *Id*.  Put simply, Defendant was put on notice that its detainees had "a difficult time first accessing the clinic, and then receiving continuity of care." *Id*.  Moreover, the DOJ also put the Defendant on notice of multiple incidents within the jail that were similar to the Decedent and Plaintiff's claims for lack of medical care.  *Id*., Pg. 52-53 ¶ 283.

42.    Moreover, the DOJ also put Defendant on notice that its jail had significant issues with record keeping with notes being illegible and containing "factually inaccurate documentation." *Id.*, Pg. 53 ¶ 285. And that detainees with serious medical conditions "cannot obtain timely and appropriate care," and that such "deficiencies violate generally accepted correctional" health standards. *Id.* ¶ 287. Moreover, detainees with a history of seizures would not receive proper medication upon arrival and would suffer seizures within a few days of being in the jail leading to injuries. *Id.* ¶ 288. Moreover, the DOJ put Defendant on notice of many detainees who were evaluated by the clinic and were sent back to their cell with little to no medication or evaluation where the detainees in question shortly thereafter died. *Id.* ¶ 289.

43.    Additionally, the DOJ put the Defendant notice that its Jail "lacks adequate video surveillance and supervision in various holding areas," and that people could die as a result of those failures. *Id.*, Pg. 54 ¶ 290. And, that this made it "difficult to supervise." *Id.* Furthermore, the DOJ put the Defendant on notice of the impact of overcrowding on its jail. *Id.*, Pg. 55 ¶ 295. That "[j]ail crowding affects multiple [j]ail systems," among which includes the fact that it "impedes detainee access to medical care, indirectly affects detainee hygiene, and reduces the staff's ability to supervise the detainees in a safe manner." *Id.* And that many of the areas of the jail lacked video surveillance. *Id.* ¶ 296.

### iii.    TEXAS COMMISSION ON JAIL STANDARDS REPORTS

44.    The Texas Commission on Jail Standards also put Defendant's policymakers on notice. As background, in 1975, the Texas Legislature created the Commission on Jail Standards (hereinafter referred to as the "TCJS") to implement a state policy that all county jail facilities conform to minimum standards of constructions, maintenance, and operation. *See* Tex. Admin. Code § 251.1. In 1991, the Texas Legislature added the requirement for count, payment, and

16

transfer of inmates when precipitated by crowded conditions. *Id*. The duty of the TCJS is to promulgate reasonable written rules and procedures establishing minimum standards, inspection procedures, enforcement policies and technical assistance for the maintenance and operation of jail facilities as well as for the custody, care and treatment of inmates. *Id*. (1-2). And, from time-to-time, the TCJS has issued reports that have put Defendant's policymakers on notice.

45.     First, on March 11, 2016, the Texas Commission on Jail Standards (hereinafter referred to as the "TCJS") issued a report that further put the Defendant on notice. *See* Related Civil Action, Doc. 1, Pg. 66 ¶ 338. As background, the TCJS is responsible for inspecting county jails to determine if they meet minimum standards, and may from time to time, conduct reviews of in-custody deaths. *Id*., Pg. 65 ¶ 336. In that report, the TCJS issued a notice of non-compliance when the Defendant failed to provide medical services to a detainee making five (5) different medical requests. *Id*. ¶ 338. These requests spanned over the course of an entire month, and yet the detainee was not provided with any medical services within the minimum thirty (30) day requirement. *Id*. In relevant part, the TCJS put Defendant on notice of the following:

> "Documentation received and reviewed by the Commission revealed that Harris County did not provide MHMR services within thirty days after the requests had been submitted by the inmate. The inmate in question requested MHMR services on 10/30/2015, 11/02/2015, 11/08/2015, 11/10/2015 and 11/23/2015. The inmate in question had the paperwork triaged on each occasion and the inmate was deemed a level 3. Per Harris Co. policies and procedures, level 3 type inmates are to be seen by the clinician within 30 days of the triage which failed to occur."

> *See* Related Civil Action, Doc. 1, Pg. 66 ¶ 339.

That report shows an official record that Defendant's policymakers were aware of the lack of rapid and sufficient medical care to detainees. *Id*. ¶ 340. This is almost identical to the DOJ Report which found a similar incident of a detainee not receiving medical care despite four (4) different

17

requests. *Id*. This report is also consistent with several incidents at or around this time of detainees failing to receive any medical care. *Id*.

46.    Second, on February 21, 2017, the TCJS issued yet another notice of non-compliance in a special inspection report while inspecting the in-custody death of detainee Vincent Young. *Id*., Pg. 66 ¶ 342. In this report, TCJS noted that the jail was required to conduct face-to-face observations with detainees. *Id*., Pg. 67 ¶ 343. But Defendant failed to properly do so, and Young died as a result. *Id*. ¶ 344-346. Hence, this report is evidence that Defendant knew that the jail suffered from a failure to properly observe and monitor their detainees, to prevent them from inuring themselves and to provide timely medical care. *Id*. ¶ 347. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

47.    Third, on April 3, 2017, the TCJS issued another notice of non-compliance to the jail based on a special inspection report when two (2) detainees were left in a transport van at the jail for ten (10) hours. *Id*., Pg. 67 ¶ 349. The TCJS found that the jail had failed to properly observe and monitor the two (2) detainees because they were left in an unsupervised van, and that the Defendant had not conducted face-to-face observations as they were required to do so. *Id*., Pg. 67-68 ¶ 350. The only way Defendant had become aware of the detainees being left in the vehicle was a report from a member of the public who passed the vehicle and heard banging on the walls. *Id*., Pg. 68 ¶ 351. Hence, this report evidences that Defendant's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. *Id*., Pg. 68 ¶ 352. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

18

48.     Fourth, on December 19, 2017, the TCJS conducted a special investigation of the Defendant following the in-custody death of Maytham Alsaedy. *Id*., Pg. 68 ¶ 354. As explained elsewhere in this complaint, Alsaedy had a history of serious medical conditions which went untreated while he was in the Defendant's custody, and despite knowing about it, the Defendant fostered the conditions-of-confinement that led to his death. *Id.* ¶ 355-356. Consequently, the TCJS found that the jail was non-compliant with minimum standards because they failed to conduct proper and timely face-to-face observations of Alsaedy. *Id*. ¶ 357. Further, the Defendant permitted Alsaedy to cover his window with paper, so even though a jailer did pass by Alsady's cell, the jailer did not properly observe him or make him remove the paper. *Id*. ¶ 358. This non-compliance was a moving force behind Alsaedy's injuries, and the DOJ warned about these same dangers in the wrote detailed above. *Id*., Pg. 69 ¶ 359. That said, the TCJS report stated:

> "After reviewing documentation and video evidence in conjunction with self-reporting of the facility administration, it was determined that the 30-minute face-to-face observation, prior to the inmate being discovered, did not occur due to the inmate obstructing the view of the jailer by placing paper in the view panel. While the jailer made a round within the required time period, the jailer did not view the inmate face-to-face as required by minimum jail standards."

*See* Related Civil Action, Doc. 1, Pg. 69 ¶ 360.

Hence, this report too evidences that Defendant's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. *Id*., Pg. 69 ¶ 360. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

49.     Fifth, on August 23, 2018, the Texas Commission on Jail Standards via a Special Inspection Report put Defendant again on notice of the constitutionally deficient conditions of its confinement. This time in relation to the in-custody death of Debora Ann Lyons. *See* Related

19

Civil Action, Doc. 1, Pg. 69 ¶ 363.  Again, as background, every jail facility needs to have an appropriate number of jailers at the facility for twenty (24) hours each day, and each facility needs to have an established procedure for documented, face-to-face observation by jailers for no less than once every sixty (60) minutes.  And, observations should be performed at least every thirty (30) minutes, but the special report indicated that the Defendant had failed to do so.  *Id*., Pg. 69 ¶ 364.  Here, Lyons was able to sneak into an empty meeting room for hours where she would later come to have medical needs that were not met, and later other detainees found her unresponsive. *Id*. ¶ 365-366.  By failing to properly observe and monitor Lyons, Defendant failed to prevent her from dying and failed to timely provide her with adequate and sufficient medical care.  *Id*., Pg. 70 ¶ 367.  In relevant part, the TCJS found Defendant to be non-compliant and stated the following:

> "After reviewing documentation and video evidence in conjunction with self-reporting by facility administration, it was determined that the inmate was not observed every 30 minutes prior to being discovered.  While the jail made a round within the required period in the inmates' cellblock, the jailer did not view the inmate face-to-face due to the inmate leaving the cellblock for medicine call and never returning."

> *See* Related Civil Action, Doc. 1, Pg. 70 ¶ 368.

Hence, this report also evidences that Defendant's policymakers knew that the county jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.  *Id*., Pg. 70 ¶ 369.  These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

50.     Sixth, on December 4, 2020, the Texas Commission on Jail Standards again put the Defendant on notice that each of its facilities needed to have the appropriate number of jailers at the facility twenty-four (24) hours each day, and need to have an established procedure for documented face-to-face observation of all inmates by jailers no less than once every sixty (60)

minutes, and that observations needed to be performed at least every thirty (30) minutes but that the Defendant had failed to do so. This time it did so via its annual inspection of the Harris County Jail, and found the jail non-complaint in multiple areas. *Id*., Pg. 70 ¶ 371. Firstly, the TCJS noted that "it was determined that staff [were] routinely not completing the initial classification assessment and re-assessments properly." *Id*., ¶ 372. Secondly, the TCJS noted that the jail staff was not filling out the detainee medication files correctly with many detainees' records being left blank. *Id* ¶ 373. To be fair, the records did not show if the medications were issued or if they were refused. *Id*. Either way, the reality is Defendant continues to employ a pattern, practice, and policy of recklessly disregarding inmates' rights in this area because currently far too many detainees do not receive their medication and their files are either blank or filled-out incorrectly. *Id*., Pg. 71 ¶ 373. Thirdly, the TCJS found that the jail staff were not filling-out medical health screening forces correctly resulting in many detainees not being classified within the proper health category. *Id*. ¶ 374. Fourthly, the TCJS found significant failures by Defendant in the area of supervision when it came to conducting face-to-face observations of inmates ranging from 3 minutes to 464 minutes. *Id*. ¶ 376. Hence, this report also evidences that Defendant's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. *Id*., Pg. 71 ¶ 376. It also provides evidence that Defendant has ongoing issues with properly documenting and providing medications to their detainees. *Id*, Pg. 71 ¶ 377. These same customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

51.    Seventh, on April 6, 2021, the TCJS issued yet another report and notice of noncompliance to the Defendant that put its relevant policymakers on notice. *See* Related Civil Action, Doc. 1, Pg. 72 ¶ 379. This time it related to the in-custody death of Jaquaree Simmons.

21

*Id*. ¶ 380.  Simmons had been beaten by multiple detained officers, and then left inside of his cell alone without any observation or medical care even though he obviously needed it.  *Id*.  The TCJS found that Defendant was still non-compliant with the minimum observation requirements as identified in the December 8, 2020 report.  *Id*. ¶ 381.  To be exact, observation of the inmates by jail staff in the relevant area was not documented for over four (4) hours.  *Id*. ¶ 382.  Additionally, although video surveillance was submitted and reviewed, the TCJS was unable to clearly identify when observation rounds were conducted by jail staff.  *Id*.  Hence, the Defendant had not observed any of the detainees within the pod that also contained Simmons.  *Id*. ¶ 383.  Defendant was suffering from his injuries during this time and needed continuous medical treatment but it was not provided.  *Id*. ¶ 384.  By failing to provide proper face-to-face observation and monitoring of Simmons and other detainees, Defendant failed to provide sufficient and timely medical care which were moving forces behind his injuries and death.  *Id*. ¶ 383.  Hence, this report too evidences that Defendant's policymakers knew that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care.  *Id*., Pg. 73 ¶ 387-389.  These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

52.     Eighth, on November 15, 2021, the TCJS yet again put the Defendant notice that a review of documentation revealed that some face-to-face inmate observations were not performed by jailers once every sixty (60) minutes as required, and that anywhere between ninety (90) and one-hundred and forty-four (144) minutes passed between round conducted.  Moreover, it was also found that the proper ratio of guards to inmates had not always been maintained as required.  Hence, this report too evidences that Defendant's policymakers knew that the jail suffered from a

22

failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

53.    Nineth, on December 7, 2021, the TCJS issued its annual inspection report, and it found the Defendant to be in continuous non-compliance in multiple areas. *See* Related Civil Action, Doc. 1, Pg. 73, Pg. 73 ¶ 390. Namely, the TCJS found that Defendant had not conducted face-to-face observations in a timely and sufficient manner with as many as ninety (90) to one-hundred and forty-four (144) minutes between rounds. *Id*. ¶ 391. Moreover, the TCJS also found that compounding issues in Defendant's use of supervisors and essential personnel including intake personnel to work housing to meet their 1:48 ratio requirements. *Id*. ¶ 392. This report is additional evidence that despite being made aware of the issues through numerous non-compliance notices, the Defendant and its policymakers continued to know that the jail suffered from a failure to properly observe and monitor their detainees to prevent them from injuring themselves or others and to provide timely medical care. *Id*. ¶ 395. It also provided evidence that Defendant has ongoing issues with properly documenting and providing observations of the detainees. *Id*. ¶ 396. Further, this report exemplified the staffing and overcrowding issues which were part of Defendant's ongoing policy which inhibits proper medical care, proper supervision, and proper deterrence of violence both amongst the detainees and by officers on detainees. *Id*. ¶ 397. These same policies and customs identified in this report were also moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

//

//

23

### iv.    LAWSUITS AND SETTLEMENTS

54.    Defendant and its policymakers also had notice via similar lawsuits and settlements filed in courts prior to the Decedent's incident.  First, on June 2, 2015, the Defendant settled Terry Goodwin's deliberate indifference claims for $400,000.00.  Terry Goodwin's incident is described elsewhere in this petition.  Second, on December 30, 2018, Vincent Young filed a lawsuit against Defendant which also put Defendant and its policymakers on notice.  Young's incident is described elsewhere in this petition.  Third, on August 21, 2018, Defendant settled Christopher Johnson's deliberate indifference claims.  Johnon's incident is described elsewhere in this petition.  Fourth, on August 24, 2018, Defendant settled Michael Alaniz's deliberate indifference claims.  Alaniz's incident is described elsewhere in this petition.  Fifth, on January 29, 2019, Defendant settled Lucas's deliberate indifference claims as well.  Lucas's incident is described elsewhere in this petition.  Sixth, on September 10, 2020, Defendant was hit with a deliberate indifference lawsuit from a Natividad Flores.  Flores' incident is described elsewhere in this petition, and Defendant later settled with Flores.  Seventh, on September 10, 2021, Defendant was also hit with a deliberate indifference lawsuit from a Tron Madise.  Madise's incident is described elsewhere in this petition.  Eight, on October 28, 2021, Defendant settled with a Jerome Bartee who too filed a deliberate indifference lawsuit.  This case resulted in the following a written opinion, _Bartee v. Harris Cty._, 2018 U.S. Dist. LEXIS 232945 *2 (S.D. Tex. 2018), which too put the Defendant on notice.  Bartee's incident is described elsewhere in this petition as well.  Hence, all of these lawsuits, settlements, and written judicial opinions put Defendant and its policymakers on notice.

### v.    PUBLIC STATEMENTS OF THE POLICYMAKERS

55.    Public statements by Defendant's own policymakers also shows that the Defendant has actual knowledge and notice of the problems in the jail resulting in violations of inmates' civil

24

rights.  To start, on September 7, 2016, Defendant's Sheriff (*i.e*., one of its policymakers) held a press conference and admitted that the Defendant has had "failed leadership" that "has left the jail woefully understaffed by a young workforce." *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *3, *11-12 (S.D. Tex. 2018).  Next, on October 26, 2016, Defendant's then county Sheriff incumbent Ron Hickman, and his then-challenger Ed Gonzalez (and eventual election-winner) engaged in a public debate.  *Id*., Pg. 56 ¶ 300. During it, both policymakers acknowledged the rampant issues within the jail and said that things needed to change.  *Id*.

56.    The second question in the debate was directed at Sheriff Gonzalez, and it went: "*Mr. Gonzalez, a concerning number of people have died in the Harris County Jail, that's a number that has, that's not new, it's going on for some time, how can those kinds of deaths be prevented?*" *Id*., Pg. 56-57 ¶ 301.  His response revealed his own, personal knowledge concerning the ongoing civil rights violations against detainees which were also referenced in the DOJ report, and which continue to occur presently— he said:

> "Well, I think we need to change the culture…. We need to… leverage[e] technology, there's technology available that could help reduce [deaths] … uh … for example by measuring when there's a decreased pulse inside the jail cell.  We need to be pursuing that. We also need to make sure that we're better training our deputies and detention officers as well as the triage when they first come in… employees are being forced to work mandatory overtime, they're overworked, moral is poor, bad decisions happen when that's occurring so we need to make sure that we change.  And we also need to improve training as well… it starts with leadership.  We've got to end this culture."

*See* Related Civil Action, Doc. 1, Pg. 57 ¶ 302.

Moreover, during the debate Mr. Gonzalez also referenced a 2015 incident where the TCJS had found the county to be non-compliant for refusing to provide medical treatment to a patient on four (4) different occasions.  *Id*., Pg. 67 ¶ 303.  And Mr. Gonzalez further stated that this "is nothing new," and that it was "a culture" where "something should have been done" because that could "be your daughter, your granddaughter [or] could have been one of our loved ones."  *Id*. ¶ 304.

25

57.    Thereafter, continuing with debate questions, the moderators put Gonzalez on notice of the "overcrowding problem" to which he responded that he was going "to make sure that we lower our jail overpopulation."[4]  *Id*., Pg. 58 ¶ 305. And in his response, he added that if changes were not made, we would "continue to see a lot of the same problems."  *Id*. ¶ 306.

58.    Next, Defendant's Sheriff Gonzalez also recognized the staffing issues within the jail by pointing out the requirements for staff to work overtime and criticized his predecessor, Mr. Hickman, by stating that there were too many people in the laundry, kitchen and other areas when they should be focusing on the positions that must meet the 1:48 ratio.[5]  *Id*., Pg. 58 ¶ 307.  And, in his closing argument during said debate, Defendant's Sherrif Gonzalez reiterated that he personally had the skills to "clean up our county jail" because "too many inmates [were] losing their lives or are less safe."  *Id*. ¶ 308.

59.    Said debate, held on October 26, 2016, exemplifies how long the county leadership and policy makers have had knowledge of the civil rights violations, and the injuries and deaths resulting thereof, because clearly it has been at the center of public discussion, with a high degree of publicity. Therefore, it cannot be denied that Defendant has long had notice of the unconstitutional policies and customs identified in this complaint which are the moving forces behind the constitutional violations suffered by the Decedent, Plaintiff, and Plaintiff.

60.    As has been demonstrated, Defendant's own Sheriff himself stated that he had ample actual knowledge of these long-standing county policies, practices and customs when he

---

[4] When looking at jail population statistics, the Defendant's jail population is much higher now, and is much higher than it was during the tenure of Defendant Sheriff Gonzalez's predecessor, Mr. Hickman.

[5] This practice of pulling unqualified staff from other positions to meet the 1:48 ratio is the exact sort of policy that the TCJS found Defendant to be non-complaint of in its November 2021 Report and Notice of Noncompliance.

became the county Sheriff and administrator of this jail, where, due to said well-established policies, practices and customs, the deaths and injuries of inmates has only increased, despite Defendant's Sheriff Gonzalez taking over the jail administration. *Id*., Pg. 58-59 ¶ 309.

**vi.    SUBSEQUENT EVENTS ALSO SHOW DISPOSITION**

61.    Defendant's deliberately indifferent disposition may also "be inferred from conduct after the events" of the underlying incident. *See e,g., Grandstaff v. City of Borger, Tx*. 767 F.2d 161, 171 (5th Cir. 1985).  Indeed, other subsequent incidents following the Decedent's incident may also permit a reasonable jury to conclude that the underlying incident was part of a continuing pattern such that Defendant should have known the pattern existed at the time of the use of force incident at issue in the lawsuit. *See e.g*. *Ramirez v. Escajeda*, No. 3:17-cv-00193-DCG (W.D. Tex., Aug. 20, 2021) at Pg. 51-54 (denying summary judgment where the pattern consisted of incidents before and after the underlying one).  Here, after the Decedent's incident, the TCJS continued issuing reports which add evidence showing Defendant's policymaker's deliberate indifference.

62.    On February 13 to 17, 2023, the TCJS conducted a special investigation of the Defendant in response to numerous deaths within the jail from December 2022 and January 2023. *See* Related Civil Action, Doc. 1, Pg. 77 ¶ 414.  On March 8, 2023, the TCJS issued its report which again found the Defendant was non-compliant with numerous minimum jail standards established by law and regulations.  *Id*. ¶ 415.  Notably, the TCJS noted that the same areas that were supposed to have been corrected by the Defendant, after previous non-compliance reports, in reality had not yet been addressed or fixed.  *Id*.  Firstly, the TCJS found that numerous detainees were supposed to be booked, medically evaluated, and placed in detainee housing within forty-eight (48) hours of arrest, but instead they were being held in holding cells without proper evaluation for much longer than the forty-eight (48) minimum.  *Id*. ¶ 416.  Secondly, the TCJS

27

found that the Defendant continued to be non-compliant as to not providing timely and sufficient medical care to detainees. *Id.* ¶ 417. Specifically, the TCJS found that detainees were not being seen within forty-eight (48) hours after placing medical requests in medical kiosks. *Id.* Thirdly, the TCJS found that several officers who were supposed to have suicide preventing training had not received the training in accordance with jail polices. *Id.* ¶ 418. Fourth, the TCJS also found that the Defendant continued to be in non-compliance with the minimum observation requirements, and that the jail staff, on a "*routine basis*" (custom), exceeded the minimum observation requirements for detainees that required sixty-minute intervals by up to one (1) hour and thirteen (13) minutes. *Id.*, Pg. 78 ¶ 419. Fifth, the TCJS also found that "staffing was not sufficient to perform the required functions" despite Defendant's documentation that alleged that they did have enough staff. *Id.* Pg. 79 ¶ 423. Particularly, the staff on the third (3rd) floor of the jail facility located at 701 Baker Street only had thirteen (13) officers when fourteen (14) were needed, and the fourth (4th) floor only had thirteen (13) when fifteen (15) were needed. *Id.* ¶ 424. Hence, the Defendant does not have sufficient staff to perform required functions which include "transporting of inmates, medications passes, face to face observations and feeding." *Id.*

63.    Separately, in a more recent TCJS report dated April 17, 2023 it shows the deliberate indifferent disposition of Defendant's policymaker. *Id.* Pg. 81 ¶ 429. Following the in-custody death of Fabien Cortez, described elsewhere in this petition, the TCJS again found the Defendant non-compliant with even minimum standards. *Id.* To be more precise, the TCJS found that Cortez was permitted to enter a restroom for eighty-eight (88) minutes before he was discovered dead and with medical care being failed to be provided to him. *Id.* ¶ 430. And, again on August 28, 2023, the TCJS again issued yet another notice of non-compliance telling Defendant that regular observation by corrections officers of the inmates was always required, and that the

28

number of jailers was not adequate or acceptable. Thus, the proper ratio was still not being maintained by the Defendant, in violation of the standards established by law or regulation, and once again establishing that the Defendant had a different, and well-established custom, policy or practice that has been the moving force of constitutional rights' violations in the county jail. The Defendant cannot seriously claim in this case, or any other, that it is following the law, obeying the constitution, and respecting the statutory and constitutional civil rights of the inmates it has under its care and custody in its local county jails.

## C.    CONSTITUTIONAL VIOLATION AND MOVING FORCE

### i.    THE CONSTITUTIONAL VIOLATION

64.    Decedent, like many other jail inmates, suffered constitutional violations whose moving force was Defendant's well-established and well-known custom, policy or practice, which has not changed for years, if not decades.  The constitutional rights of a pretrial detainee, like the Decedent, flow from the procedural and substantive due process guarantees of the Fourteenth Amendment of the U.S. Constitution. *See  Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996); *Valencia v. Wiggins*, 981 F.2d 1440, 1443-45 (5th Cir.), cert. denied, 113 S. Ct. 2998 (1993); *see also Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *102 (S.D. Tex. 2018) (finding issues of material fact precluded summary judgment on denial of medical care claim); *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.) (finding that, under the Due Process Clause of the Fourteenth Amendment, Harris County jail pre-trial detainees have a constitutional right to "basic human needs, including medical care and protection from harm").

65.    Indeed, it is well established that, when the State or arm of the State takes a person into custody and holds the person in a jail involuntarily, against its will, the U.S. Constitution imposes upon the State numerous corresponding duties to assume some responsibility for that

29

person's safety and general well-being. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). The ultimate constitutional duty of the government in those circumstances is to assume some responsibility for the safety and general well-being of persons whose state-occasioned confinement renders them unable to fend for themselves. *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996). Among those clearly established constitutional duties is to provide appropriate medical care. *Sanchez v. Young County*, Tex., 866 F.3d 274, 279 (5th Cir. 2017). Which means that the Decedent had a constitutional right to have his serious medical needs met by the county jail administrators, and to be protected from custom, policy or practice that shows deliberate indifference to his civil rights. *See Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022); *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). A serious medical need is one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required. *Sims v. Griffin*, 35 F.4th 945, 949 (5th Cir. 2022); *see also Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *104 (S.D. Tex. 2018). As such, when a jail official refuses to treat an inmate, ignores his complaints, intentionally treats him incorrectly, or engages in any similar conduct that would clearly evince a wanton disregard for any serious medical needs, the constitutional has been violated. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006).

66.     More specifically, if a county jail inmate suffers as a consequence of the jail staff's wanton disregard of his or her medical needs, the Due Process Clause of the Fourteenth Amendment has been violated. *Austin v. City of Pasadena*, 74 F.4th 312, 327 (5th Cir. 2023); *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020); *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001). To that point, the purpose of requiring state jail officials to provide medical care to a pretrial detainee, like the Decedent, is to prevent the detainee from suffering further physical pain or harm. *Hare v. City of Corinth*, 74 F.3d 633, 644 (5th Cir. 1996). Given so, a delay in medical

30

care violates the Constitution where it has been done with deliberate indifference that results in substantial harm. *Austin v. City of Pasadena*, 74 F.4th 312, 327 (5th Cir. 2023); *Dyer v. Houston*, 964 F.3d 314, 327 (5th Cir. 2020). Here, such deliberate indifference is shown through a pattern of incidents. *Infra*.

### ii. MOVING FORCE

67. For moving force purposes, a plaintiff need only show that the municipal action or inaction was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights. *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *9 (S.D. Tex. 2018). A plaintiff meets the culpability showing if the municipality adopted a policy with deliberate indifference to the "known or obvious consequences" that a constitutional violation would result. *Id*. *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *9 (S.D. Tex. 2018). Here, the Plaintiff's theory of causation is glaringly obvious: she alleges failure to observe/monitor, failure to provide medical care, systematic understaffing and overcrowding, and disparate staff scrutiny/security screenings customs, policies, and practices and that the Decedent was a victim of the same.

### iii. PATTERN OF INCIDENTS

68. Constitutional challenges by pretrial detainees may also be brought under a conditions of confinement theory. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *125 (S.D. Tex. 2018). A conditions of confinement theory would be based on "Harris County's policies, customs, and practices" such that it is an attack on the "general conditions, practices, rules, or restrictions of pretrial confinement." *Id*., *125. A plaintiff challenging jail conditions needs only demonstrate a **pervasive pattern** of serious deficiencies in providing for his basic human needs. *Id*. (emphasis added). This pattern may include incidents preceding and succeeding

31

a Plaintiff's incident. *Infra.* At this time, the Plaintiff is aware of the following pervasive pattern preceding the Decedent's incidents:

a.   **Terry Goodwin**. *See* Related Civil Action, Doc. 1, Pg. 111-112 ¶ 660-672. On June 2, 2015, the Defendant settled Goodwin's deliberate indifference claims for $400,000.00. Goodwin had been locked in a cell for months without observations other than food placed under his door with a sign telling officers not to open the cell. During this time, Goodwin's mental and physical health deteriorated which ultimately required a stay at a mental health facility. At some point, a jail compliance team entered Goodwin's cell and found him filthy with a shredded jail uniform with shards of clothing hanging from the ceiling where he had attempted to hang himself. The cell had not been opened for months with observations not being conducted other than food placed under his door with a sign on the door telling officers not to open the cell. Officers, supervisors, medical staff and the head of the jail knew for weeks about Goodwin's conditions of confinement. Defendant, however, did not begin an investigation into this until almost a year after Goodwin was discovered by a whistleblower. Defendant's Sheriff openly admitted that there were "breakdowns in leadership" that "led to an atmosphere" of "deference." The failure to properly observe and monitor Goodwin and conduct proper face-to-face observations led to inadequate medical care being provided to him and allowed him to be stuck in inhumane conditions in his own feces and waste that was the moving force in the cause of his injuries. Failure to provide Goodwin with medication and medical attention for his known medical needs including his mental illness led to the deprivation of Goodwin's constitutional rights by being deliberately indifferent to the known and obvious risk that led to his injuries. Defendant's rampant practice and policies of understaffing and overcrowding the jail and lack of training and supervision impeded Goodwin's access to medical care, reduced the jailer's ability to properly observe the detainees, led to the deliberate indifference to the needs of human decency by allowing Goodwin to remain in the cell for over two (2) months as it was more convenient to leave him in the cell by himself rather than providing him with basic care which were all moving forces behind Goodwin's injuries.

b.   **Rachel Hatton**. *See* Related Civil Action, Doc. 1, Pg. 140-141 ¶ 851-857. On or around May 7, 2016, Defendant booked Hatton into the Harris County Jail. While the Plaintiff waited in line with other detainees, the Defendant charged and punched her, causing her to lose consciousness. "Oh my gosh, her head!" yelled an inmate who witnessed the violence. Upon information and belief, for some time, Hutton was denied immediate medical care. After which, Hutton woke up in the clinic and was returned to her cell. There, Hutton asked the guards all night asking for medical care but they never responded. Defendant's rampant practices and policies of understaffing,

32

overcrowding the jail and lack of training and supervision were all moving forces behind these injuries.

c.   **Vincent Young**.  *See* Related Civil Action, Doc. 1, Pg. 82 ¶ 436-452.  On February 7, 2017, Defendant booked pre-trial detainee Young into its jail facility.  *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 648 (S.D. Tex. 2021) (Ellison, K.).  During intake, he complained of serious medical conditions such as back pain, high blood pressure, anxiety, and depression.  *Id*. Defendant ordered Young's abrupt cessation with Xanex, and replaced it with Librium, a side of effect of which is suicidal tendencies which is also a side effect of Xanex withdrawal.  After which, Young advised the Defendant that he wanted to kill himself.  *Id*.  Deliberately indifferent, however, Defendant failed to act, and Young did, in fact, kill himself.  *Id*. Upon investigating Young's death, the Texas Commission on Jail Standards issued the Defendant a notice of non-compliance finding that Harris County had failed to meet the minimum by forty-four (44) minutes.  As it turned out, Defendant had failed to step inside Young's cell for six (6) hours.  The jailer responsible for checking Young's cell had recorded numerous cell checks that had actually never happened, stating that he was too busy doing other jobs to conduct proper rounds.  The Texas Rangers found numerous discrepancies in round sheets where rounds were said to be conducted when, in fact, they were not conducted at all or were done improperly.  Failure to properly observe and monitor Young and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Young's death.  Failure to provide Young with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Young's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Young's death.  Defendant's rampant practice and policies of understaffing, lack of training, lack of supervision, and overcrowding the jail impeded Young's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Young's death.

d.   **Maytham Alsaedy**.  *See* Related Civil Action, Doc. 1, Pg. 84-85 ¶ 453-465. At all times relevant, Defendant knew that Alsaedy had serious and persistent mental illness that required medical attention.  Defendant, however, failed to properly treat Alsaedy for his mental illness.  On November 30, 2017, Alsaedy covered his cell's window with paper, and the Defendant never noticed the paper, made him remove the paper, or even attempted to observe Alsaedy in his cell.  Defendant failed to make any face-to-face or any other visual observation of Alsaedy.  While the Defendant was deliberately indifferent, Alsaedy hanged himself.  After which, the Texas Commission on Jail Standards once again found that Harris County was not compliant with the minimum observation requirements as the jail had permitted Alsaedy to place paper over his view panel, failed to make him remove the paper, and failed to make any visual

33

check on Alsaedy for the required time period.  The failure to provide Alsaedy with his medications and medical attention for his ongoing mental and physical issues led to the deprivation of Alsaedy's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Alsaedy's death.  Defendant's rampant practice and polices of understaffing and overcrowding, lack of training and supervision impeded Alsaedy's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Alsaedy's death.

e. **Debora Ann Lyons**.  *See* Related Civil Action, Doc. 1, Pg. 85-86 ¶ 466-479.  Defendant booked Lyons into its jail facility.  At which, Lyons had a history of mental illness and making suicidal statements.  On August 14, 2018, Lyons exited her cell to receive insulin, grabbed a sheet, and placed it around her waist.  Thereafter, she entered a multi-purpose room and closed the door behind her.  Defendant then failed to observe her throughout this timeframe, and did not conduct a face-to-face observation with her during normal rounds.  And, because of this deliberate indifference and conditions of confinement, Lyons was able to successfully kill herself.  After which, the Texas Commission on Jail Standards issued yet another notice of non-compliance.  Failure to properly observe and monitor Lyons and conduct proper face-to-face observations led to inadequate medical being provided to her in a timely manner and ultimately caused her farther.  Failure to provide Lyons with her medications and medical attention for her ongoing mental and physical issues led to the deprivation of Lyons' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Lyon's death.  Defendant's rampant practice and polices of understaffing, overcrowding, lack of training and supervision for the jail reduced the jailer's ability to meet proper observation requirements resulting in Lyon's death.

f. **Christopher Johnson**.  *See* Related Civil Action, Doc. 1, Pg. 114-116 ¶ 683-694.  On August 21, 2018, Defendant settled with Johnson.  Before then, Defendant's deputy detained Johnson and took him to take a booking photograph (i.e., a mug shot.  *Johnson v. Harris County*, 2018 U.S. Dist. LEXIS 239371 *1 (S.D. Tex. 2018).  Plaintiff smiled, and the Defendant told the Plaintiff: "If you don't stop smiling, we gon' to make you stop smiling."  *Id.*, *4.  The Defendant then violently grabbed the Plaintiff's neck and used excessive force to do so.  *Id.*, *24-25.  After which, Defendant refused to provide Johnson with medical treatment for his injuries.  *See* Related Civil Action, Doc. 1, Pg. 114 ¶ 668.  Then, to make matters worse, Defendant falsified reports on what transpired.  In light of all of that, failure to provide Johnson with medical attention for his injuries led to the deprivation of Johnson's constitutional rights by being deliberately indifferent to the known and obvious risk.  Moreover, Defendant's rampant practice and polices of understaffing, overcrowding, lack of training and

supervision for the jail reduced the jailer's ability to meet proper observation requirements resulting in the injuries that Johnson suffered.

g.   **Michael Alaniz**.   *See* Related Civil Action, Doc. 1, Pg. 118-120 ¶ 715-725. On August 24, 2018, Defendant settled with Alaniz in the case stylized as *Alaniz v. Two Unknown Harris County Office Deputies*, Cause No. 4:16-cv-01495 (S.D. Tex., filed May 27, 2016).   Before then, in a four-by-eight (4x8) closet cell Defendant had struck Alaniz with both hands just under his scapulae near his thoracic spine without any provocation or warning.   After which, Alaniz fell forward landing directly on his face with the tip of his nose.   While the Plaintiff was on the ground, the Defendant grounded the Plaintiff's skull, nose-first into the cold concrete floor with one knee firmly planted in the middle of Alaniz's back.   Then, the Defendant smashed a boot to the Plaintiff face while he lay helpless on the ground and unconscious. After which, Alaniz requested medical attention for his serious medical injuries but the Defendant denied to provide him such treatment.   In light of all of that, failure to provide Alaniz with medical attention for his injuries led to the deprivation of Alaniz's constitutional rights by being deliberately indifferent to the known and obvious risk.

h.   **Tracey Whited**.   *See* Related Civil Action, Doc. 1, Pg. 87-88 ¶ 480-489. Defendant booked Whited into its jail facility.   During her stay, she had a history of serious mental illness and making suicidal statements.   On January 14, 2019, Defendant failed to observed Whited attempting to hang herself while she was in a general population cell.   Instead, an inmate advised the Defendant that Whited had hung herself.   And, because of Defendant's deliberate indifference, Whited successfully killed herself. Thus, the failure to provide Whited with medical attention for her ongoing mental issues and suicidal ideations led to the deprivation of Whited's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Whited's death.   Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Whited's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Whited's death.

i.   **Kenneth Lucas**.   *See* Related Civil Action, Doc. 1, Pg. 138-140 ¶ 841-850. On January 29, 2019, the Defendant settled Lucas's deliberate indifference claims for $ 2.5 million.   Before that, the Defendant, dressed in protective clothing, had lined up in a single file "stick," entered Lucas' cell, and forced Lucas to the floor using a Plexiglas shield, handcuffed him, shackled his legs, which were then crossed and bent back at the knees.   *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *8 (S.D. Tex. 2018).   Defendant then placed Lucas face down onto a gurney for transport.   *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *8 (S.D. Tex. 2018).   After which, the Defendant heard Lucas say, "I can't breathe," and the Defendant did nothing because "[i]f you're talking, you're breathing." *Salcido v. Harris Cty.*, 2018

35

U.S. Dist. LEXIS 212983 *26 (S.D. Tex. 2018). Thereafter, the Defendant did not tell the doctor that Lucas had said that he could not breathe. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 212983 *26 & *50 (S.D. Tex. 2018). Such an inability to breathe is a serious medical need of which all reasonable officers would be aware and is not subject to debate. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 212983 *27 (S.D. Tex. 2018) (finding that a "reasonable jury could conclude that Harris County trained its officers to ignore complaints" and "that that training reflects deliberate indifference to a serious medical need.").

j.  **Kareem Jefferson**. *See* Related Civil Action, Doc. 1, Pg. 122-124 ¶ 738-746. On May 29, 2019, Defendant was in the process of releasing Jefferson from its jail facility. During which time, the Defendant violently slammed Jefferson to the ground, seriously injured him, and placed him into back into custody. Upon information and belief, the Defendant failed to then provide Jefferson with adequate medical care to attend to serious injuries that it had just then caused to Jefferson. Failure to provide Alaniz with medical attention for his injuries led to the deprivation of Alaniz's constitutional rights by being deliberately indifferent to the known and obvious risk.

k.  **Natividad Flores**. *See* Related Civil Action, Doc. 1, Pg. 121-122 ¶ 726-737. On July 27, 2019, Defendant arrested and transported Flores to its jail facility. Upon arrival, Flores disclosed a serious medical condition—epilepsy. During intake, Flores asked Defendant for his prescribed mediation but Defendant refused to provide it. Further being deliberately indifferent, Defendant assigned Flores to a top bunk when a bottom bunk is more appropriate for an individual with a serious epilepsy medical condition. On July 29, 2019, Flores suffered from a seizure while on the top bunk and fell to the floor. There, he suffered a serious head injury where he bled excessively and was in excruciating and radiating pain. Upon information and belief, the Defendant delayed in providing medical care. Flores thereafter filed a lawsuit against Defendant, stylized as *Natividad Flores v. Harris County*, 4:20-cv-03162, Dkt. No. 72 (S.D. Tex. filed May 10, 2022) in which the Defendant settled with Flores, paying him an undisclosed amount. Thus, the Defendant had failed to properly observe and monitor Flores, conduct proper face-to-face observations, and complete intake documents properly. These things among other things led to inadequate medical care being provided to Flores in a timely manner and ultimately caused Flores' injuries. Failure to provide Flores with medication and medical attention for his known medical needs including epilepsy led to the deprivation of Flores' constitutional rights by being deliberately indifferent to the known and obvious risk that Flores would suffer seizures without medication and would fall from his seizures from the top bunk. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Flores' access to medical care, including not having sufficient staff to pass out medications, resulting in mediations

either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow-up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Flores' injuries.

l.    **Wallace Harris**.  *See* Related Civil Action, Doc. 1, Pg. 88 ¶ 490-498.  On May 1, 2020, Defendant booked Harris into it jail facility.  At the time, he had serious medical conditions such as hypertension which required ongoing medication and medical care.  Defendant, however, failed to provide Harris with adequate medical screening or medical care during his time in jail.  On May 6, 2020, Harris died a result of his medical condition.  Before that, however, Defendant had failed to properly observe and monitor Harris and conduct proper face-to-face observations and to provide him medical care.  Moreover, the failure to provide Harris with medication and medical attention for his ongoing medical condition led to the deprivation of Harris' constitutional rights by being deliberately indifferent to the known and obvious risk that led to Harris' death.  Defendant's rampant practice and policies of understaffing and overcrowding the jail and the failure to train and supervise impeded Harris' access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Harris' death.

m.    **David Perez**.  *See* Related Civil Action, Doc. 1, Pg. 89 ¶ 499-504.  On September 9, 2020, Defendant booked Perez into its jail facility.  Upon information and belief, Defendant failed to then adequately conduct a medical screening.  On September 15, 2020, Perez died and his medical cause of death allegedly "could not be determined."  Failure to properly observe and monitor Perez and conduct proper face-to-face observations lead to inadequate medical care being provided to Perez in a timely manner and ultimately caused Perez's death.  Defendant's rampant practice and policies of understaffing and overcrowding the jail and the failure to train and supervise impeded Perez's access to medical care and reduced the jailer's ability to properly observe detainees such as Perez.

n.    **Elijah Gamble**.  *See* Related Civil Action, Doc. 1, Pg. 136-138 ¶ 828-840.  On or around November 2020, Defendant booked Gamble into its jail facility. Ellijah Gamble, a member of the vulnerable LGBQT+ community, had a disagreement with another detainee, and asked to be removed from their cell, but Defendant refused.  In front of Defendant, the other detainee punched Ellijah Gamble, and knocked them down.  Then, the other detainee provided to stomp Ellijah Gamble all while the Defendant watched and did not interfere.  Although Gamble needed immediate medical attention, Defendant did not immediately provide it.  After several minutes, however, Defendant finally came into Ellijah Gamble's cell only after he was

37

crawling to the door.  Ellijah Gamble's jaw was broken.  Defendant, however, refused to wire Ellijah Gamble's mouth shut, and refused to provide Ellijah Gamble with a liquid diet.  As such, Ellijah Gamble suffered.  Thus, the failure to properly observe, monitor, and intervene when Ellijah Gamble was beat up by the other detainee despite requesting to be removed from the presence of that detainee led to inadequate protection and inadequate medical care being provided to him in a timely manner and ultimately caused Ellijah Gamble's injuries as timely intervention would have prevented his injuries, and adequate monitoring would have allowed immediate medical intervention.  Defendant's rampant practice and policies of understaffing and overcrowding, failure to train and supervise, all impeded Ellijah Gamble's access to medical care and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Gamble's death.

o.  **Israel Lizano Iglesias**.  *See* Related Civil Action, Doc. 1, Pg. 89-90 ¶ 505-514.  On February 8, 2021, Defendant booked Iglesias into its jail facility.  Defendant, however, did not immediately screen Iglesias for serious medical or mental health concerns.  Instead, he was placed in a holding cell.  During which time, Defendant did not properly observe Iglesias.  Rather, other detainees had to inform Defendant that Iglesias needed medical attention.  He became unresponsive and was pronounced dead.  Failure to properly observe and monitor him and conduct proper face-to-face observations led to inadequate medical provisions to Iglesias in a timely manner and ultimately caused Iglesias' death.  Failure to provide Iglesias with medication and medical attention for his ongoing medical condition led to the deprivation of his constitutional rights being deliberately indifferent to the known and obvious risk that led to Iglesias' death.  Defendant's practice and polices of understaffing and overcrowding the jail impeded Iglesias's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Iglesias' death.

p.  **Jaquaree Simmons**.  *See* Related Civil Action, Doc. 1, Pg. 96-102 ¶ 568-604.  On February 16, 2021, Defendant responded to water flowing under Simmons' cell door from a clogged toilet.  The only report about the incident disciplined Simmons, and stated that he was removed from his cell while it was cleaned and he was thereafter placed back into his cell "without incident" and with no report of any use of force being used.  That, however, was untrue.  Defendant had actually beat up Simmons causing a lacerated lip and eye swelling above his left eye, and then placed him in a cell that was less than fifty (50) degrees Fahrenheit.  After which, Defendant denied Simmons with adequate medical care.  Later that day, Defendant again entered Simmons' cell and viciously beat him. After which, again, Defendant denied Simmons with adequate medical care and he died.  Thereafter, on April 6, 2021, the Texas Commission on Jail Standards had issued a notice of non-compliance, finding that the Defendant had failed to

conduct proper face-to-face observations for over four (4) hours on the date that Simmon's died. Failure to properly observe and monitor Simmons and conduct face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately was a moving force in Simmon's death. Defendant's rampant practice and polices of understaffing and overcrowding the jail encouraged violence by officers against detainees, prevented the rendering of sufficient medical aid, and reduced the jailer's ability to properly observe the detainees which was a moving force in Simmon's death.

q.    **Deon Peterson**. *See* Related Civil Action, Doc. 1, Pg. 23-24 ¶ 112-120. Plaintiffs Tammy Peterson and Phillip Vallaire have appeared both individually and as representatives of the estate of Deon Peterson in this lawsuit [*Id*., Pg 2 ¶ 1] and are the mother, father and heirs of Deon Peterson [*Id*., Pg. 11 ¶ 17-18]. On February 23, 2021, Defendant booked the now decedent Deon Peterson into its jail. *Id*., Pg. 23 ¶ 112. At the time, Peterson put Defendant on notice of his history of serious medical conditions including but not limited to asthma and diabetes for which he had been prescribed several medications. *Id*., ¶ 113. In or around July 2021, Plaintiff Peterson complained of a left arm pain which is indicative of heart issues which are serious medical conditions. *Id*., Pg. 24 ¶ 114. Thereafter, on August 10, 2021, Peterson again complained of chest pain and trouble breathing. Although Peterson was taken to the clinic, he was summarily assessed and sent back to his cell. *Id*., Pg. 24 ¶ 115. While in the elevator, Peterson had to place himself on the floor due to his ongoing medical emergency. *Id*., Pg. 24 ¶ 116. The clinic, however, just simply 'looked' at him again and sent him back to his cell where Peterson would continue to complain about his ongoing chest pain which should have indicated to the medical staff a life-threatening heart condition was imminent. *Id*. But when taken back to the clinic, Defendant sat him in a chair instead of permitting him to lie to prevent him from falling should he pass out. *Id*. After which time, Peterson did pass out and violently hit his head on the ground. *Id*. Consequently, Defendant's prevalent policies, practices, and customs of failing to observe detainees, provide timely and adequate medical care and systemic understaffing and overcrowding of the jail were a moving force behind Peterson's injuries and death. *Id*.; *see also Id*, Pg. 152-153 ¶ 903-906 / Pg. 180 ¶ 1022-1024.

r.    **Rory Ward, Jr.** *See* Related Civil Action Doc. 1, Pg. 102-104 ¶ 605-616. On May 8, 2021, Defendant's detainee Melvin Johnson brutally assaulted Ward. During which time, Defendant observed Johnson stand over Ward and punch him six (6) times in the head while Ward lay on the ground lifelessly. As a result, Ward suffered a hemorrhage, intracranial hypertension, and brain death as well as visible bruising to his forehead and swelling around his right eye. Despite the obvious need for immediate medical attention, Defendant delayed in providing it. When it was

eventually provided, Defendant only provided Ward with only minor treatment for his injuries without diagnostic studies in the jail's medical clinic. Before then, the Department of Justice had cited Defendant's medical clinic as inadequate to treat such serious injuries. Nevertheless, Defendant thereafter placed Ward back in a single cell without any further medical attention or sufficient observation or monitoring in light of his condition and known head injuries. After a continued failure to observe Ward either through video or face-to-face observations, Defendant eventually discovered Ward dead in his cell. Given so, Defendant had failed to properly observe and monitor Ward through minimum face-to-face checks, video monitoring, and intermittent medical checkups despite the Defendant's awareness of Ward's serious medical head injuries. Defendant's failure to properly observe and monitor Ward and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Ward's death as timely intervention would have prevented Ward's injuries to begin with, and adequate monitoring would have noticed Ward's continuous need for medical attention. Defendant's rampant practice and policies of understaffing and overcrowded and failure to train and supervise impeded Ward's access to medical care, encouraged violence between detainees, discouraged or prevented the staff from rendering aid without evidence of physical injuries, and reduced the jailer's ability to properly observe and provide sufficient medical care to the detainees resulting in Mr. Ward's death.

s.    **Gregory Barrett**. *See* Related Civil Action, Doc. 1, Pg. 112-113 ¶ 673-682. On June 30, 2021, Defendant booked Barrett into its jail facility at which time it became aware of Barrett's pre-existing medical conditions. On August 26, 2021, Barrett told his wife during visitation that he did not feel well and was vomiting blood. The Defendant, however, did not provide him with medical treatment. Thereafter, the next day on Augst 27, 2021, Barrett continued to vomit blood and still had not received any medical attention despite the obvious need for it. Instead, Barrett was relegated to a solitary quarantine cell in lieu of receiving treatment for his non-COVID symptoms and pre-existing medical conditions where he would die. Defendant's failure to provide Barrett with medication and medical attention for his known medical needs, including pre-existing medical conditions and his vomiting of blood led to the deprivation of Barrett's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Barret's death. Defendant's rampant practice and polices of understaffing and overcrowding as well as its failure to train and supervise impeded Barrett's access to medical care and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Barrett's death.

t.    **Tron Madise**.  On or around September 10, 2021, pre-trial detainee Madise was in the custody of Defendant and was assaulted by eight-to-ten (8-10) inmates at the Harris County Jail.  Although Defendant's guards, Charles Ballard, Bryan Buccini, Paul Croas, Edmon Benavides, A. Davis, and at least three more John Doe officers could have easily intervened, they failed to do so.  Instead, they watched a five (5) minute beating of Madise, and delayed in providing him with timely, adequate and sufficient medical care.  As a result, Madise has sustained multiple injuries to multiple body parts. Hence, Defendant's rampant practice and polices of understaffing and overcrowding as well as its failure to train and supervise impeded Barrett's access to medical care and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Madise's injuries

u.    **Jerome Bartee**.  *See* Related Civil Action, Doc. 1, Pg. 108 ¶ 644-659.  On October 28, 2021, the Defendant settled with Bartee.  Before then, Bartee was a pretrial detainee at the Defendant's jail.  More than ten (10) of Defendant's Detention Officers viciously beat Bartee and caused him to suffer permanent injuries.  *Bartee v. Harris Cty.*, 2018 U.S. Dist. LEXIS 232945 *2 (S.D. Tex. 2018).  After which, upon information and belief, the Defendant denied Bartee medical care for his serious injuries.  Defendant's rampant practice and policies of understaffing and overcrowding, failure to train and supervise, all impeded Ellijah Gamble's access to medical care and reduced the jailer's ability to properly observe and provide sufficient medical care.

v.    **Fred Harris**.  *See* Related Civil Action, Doc. 1, Pg. 106-108 ¶ 627-643. During intake, Defendant became aware that nineteen (19) year-old Fred Harris "is a person with mental illness or intellectual disability. Nevertheless, Defendant placed Harris in a cell with Michael Paul Ownby, a known violent inmate weighing two-hundred and forty (240) pounds. Ownby had a conviction for felony assault, had previously attacked and injured a Jail detention officer, and had also assaulted an inmate on another occasion.  As foreseeable, on October 29, 2021, Ownby attacked Harris with a shank, knocked him to the concrete floor and began smashing his head into it.  Then, Ownby kicked Harris while he lay on the floor all while Defendant just simply watched, both in person and on video.  As there was not enough jail staff, Harris was denied immediate necessary medical care. At Ben Taub, Harris was declared brain dead and his organs were donated. Defendant's failure to properly observe and monitor Harris and his killer, Ownby, and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to Harris in a timely manner and ultimately caused Harris' death. Defendant's rampant practice and policies of understaffing and overcrowding the jail as well as failure-to-train and failure-to-supervise impeded Harris' access to medical care, and reduced the jailer's ability to

41

properly observe and provide sufficient medical care to the detainees resulting in Harris' death.

w.   **Evan Ermayne Lee**. *See* Related Civil Action, Doc. 1, Pg. 17 ¶ 66-76 and Pg. 151 ¶ 899-902. Plaintiffs Jacilet Griffin-Lee and Timonthy Lee are the mother and father of Lee. *Id*., Pg. 11 ¶ 15-16. At the time of Lee's booking on December 22, 2021, Defendant became aware that Lee had a history of mental illness including manic depression, schizophrenia, anxiety, and bipolar disorder as well as high blood pressure and diabetes. *Id*., Pg. 17 ¶ 67. Despite that, Defendant either failed to provide Lee with his medications or would provide his medications untimely. *Id*., ¶ 68. This resulted in relapsing in his mental state, suffering serious side effects, and laying in his bunk for two (2) days due to lack of medication for his diabetes. *Id*., ¶ 68. Thereafter, on or around March 9, 2022, another detainee beat up Lee, and Lee suffered from blunt force head trauma with blood on his brain. *Id*., ¶ 70. The first record of Lee receiving any medical care for his injuries was two (2) days later, but at that time the Defendant simply just looked at him and sent him back to his cell without any treatment, observation, or further diagnostic testing despite his observable head injuries and the known likelihood of suffering life threatening damages due to untreated head trauma. *Id*., Pg. 18 ¶ 71. Eventually on March 18, 2022, Defendant got around to Lee, and found him altered and disoriented and noted that he still had facial bruising. *Id*., ¶ 72. Defendant then took Lee to the hospital where it was found that he had significant head injuries with two (2) areas of brain bleed. *Id*., ¶ 73. On March 20, 2022, Lee became unresponsive and was ruled brain dead. *Id*., ¶ 74. His official date of death March 22, 2022. *Id*. Given so, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide them with timely and adequate medical care, systematic understaffing and overcrowding as well as the failure-to-train and failure-to-supervise were all moving forces behind Lee's injuries. *Id*., ¶ 75.

69.   Adding further, the deliberately indifferent disposition of the Defendant may also "be inferred from conduct after the events" of the underlying incident. *See e,g., Grandstaff v. City of Borger, Tx*. 767 F.2d 161, 171 (5th Cir. 1985). Indeed, other subsequent incidents following Plaintiff's underlying incident may also permit a reasonable jury to conclude that the underlying incident was part of a continuing pattern such that Defendant should have known the pattern existed at the time of the use of force incident at issue in the lawsuit. *See e.g. Ramirez v. Escajeda*, No. 3:17-cv-00193-DCG (W.D. Tex., Aug. 20, 2021) at Pg. 51-54 (denying summary judgment

where the pattern consisted of incidents before and after the underlying one).  At this time, the

Plaintiff is aware of the following subsequent incidents:

a.    **Henry Williams**.  *See* Related Civil Action, Doc. 1, Pg. 124-126 ¶ 747-758.
On February 21, 2022, Williams was in Defendant's custody with the
following known medical conditions: gout, high blood pressure, and
arthritis.  For at least three and a half (3.5) weeks, Defendant failed to
provide Williams with medication for the same.  Then, on February 21,
2022, Williams notified the Defendant that he was having a gout attack, and
needed the evening pill nurse.  Defendant, however, replied that "They are
short of staff, and no one would be bringing [the] medication up, and triage
would also be closed.  The next day on February 22, 2022, Williams again
put Defendant on notice that he was having a gout attack.  There, however,
was no reply whatsoever.  On February 28, 2022, Williams then filed a
grievance with the Defendant stating that he had been without medicine for
a considerable period of time.  Defendant then informed Defendant's
employee Gwen Bossett via letter of the same, and she came back and
stated, "I asked to bring you meds, and was told no."  On March 2, 2022,
Williams again notified Defendant that he was without medications, but the
Defendant replied that they do not have staff.  As a result of this deliberate
indifference, Williams suffered injury.  Defendant's rampant practice and
policies of understaffing and overcrowding the jail impeded Williams'
access to medical care, including not having sufficient staff to pass out
medications resulting in medications either not being issued or certain
detainees being skipped by rushed officers, having staff fail to properly
document and follow up with known medical issues, failure to respond to
requests from detainees for medical attention for days or weeks at a time,
and reduced the jailer's ability to properly observe the detainees and provide
them with sufficient medical care resulting in William's injuries.

b.    **Matthew Shelton**.  *See* Related Civil Action, Doc. 1, Pg. 117-118 ¶ 704-
714.  On March 22, 2022, Defendant booked Shelton into its custody.  At
the time, Defendant became aware of Shelton's serious medical conditions
which included diabetes and high blood pressure for which he required
mediations.  Although Shelton was required to take medications for those
conditions, Defendant's overcrowding, understaffing, and policies of failing
to provide medical care and medications led to Shelton not receiving his at
all after being placed into his cell.  Ultimately, on March 27, 2022, died a
diabetic ketoacidosis.  Thereafter, on December 19, 2022, the Texas
Commission on Jail Standards issued a Notice of Non-Compliance, finding
that Defendant had failed to meet even minimum jail standards by not
providing Shelton with his medications despite orders to do so.  Defendant's
failure to properly observe and monitor Shelton and conduct proper face-
to-face observations led to inadequate medical care being providing to him
in a timely manner and ultimately caused his death.  The failure to provide

43

Shelton with medical attention for his known medical needs, including diabetes and high blood pressure led to the deprivation of Shelton's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Shelton's death. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Shelton's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued of certain detainees being skipped by rushed officers, having staff fail to properly document and follow-up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Shelton's death.

c.   **Simon Peter Douglas**. *See* Related Civil Action, Doc. 1, Pg. 132-133 ¶ 800-810. On February 10, 2022, Defendant booked Douglas. During which time, Douglass began exhibiting erratic behavior consistent with mental illness. Defendant placed Douglas in an isolation cell where the attempted to hang himself. Defendant then handcuffed Douglass, and placed him in a single padded room which still had hard objects on the door and wall, and a metal grate in the middle of the floor. Despite knowing Douglas' behavior, Defendant did not restrain Douglas any further, did not place him in a suicide vest, and did not attempt to remove damaging items. Douglas then began ramming his head against the door, walls, and the metal grade continuously while the Defendant watched him harm himself repeatedly. Defendant waited for Douglas to knock himself out and then went in and carried Douglas out on a stretcher. Before arriving at the hospital, Douglas was declared dead. Defendant's failure to properly observe and monitor Douglas and conduct proper face-to-face observations including failure to interfere with Douglas' attempts at self-harm led to inadequate medical care being provided to him in a timely manner and ultimately caused Douglas' death as a proper observation and interference would have provided sufficient time to prevent his death. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Douglas' access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues including failure to properly book and evaluate detainees with known medical conditions, failure to have sufficient medical staff to be able to perform full examinations and testing on detainees, and reduced the jailor's ability to properly observe the detainees and provide them with sufficient medical care resulted in Douglas' death.

d.   **Ryan Twedt**. *See* Related Civil Action, Doc. 1, Pg. 35-37 ¶ 192-203 / 209-210 ¶ 1153-1161. Twedt is a plaintiff in this lawsuit who resides in Minnesota. *Id.*, Pg. 12 ¶ 28. On February 15, 2022, Defendant booked

Twedt into its jail facility and became aware of his serious medication conditions which included a history of mental illness, depression, anxiety, and bipolar disorder. *Id*., Pg. 35 ¶ 192. Moreover, Defendant was aware that Twedt needed to take several medications for his different disabilities, and needed to do so twice a day. *Id*. Defendant, however, would only irregularly provide Twedt with his mediations, if at all. *Id*. Without his medications, Twedt would act erratically and not think straight. *Id*., ¶ 194. On April 8, 2022, Twedt was involved in altercation with another detainee on the fifth (5th) floor, during which time the Defendant heard the other inmate state that if Twedt was ever moved to the sixth (6th) floor that he would "beat his a\*\*." *Id*., Pg. 36 ¶ 195. Shortly thereafter, Defendant so moved Twedt to the sixth (6th) floor. *Id*., ¶ 196. There, Twedt repeatedly tried to get Defendant's attention for help. Defendant, rather than listening to Twedt's concerns, handcuffed him and slammed his body against the wall and then slammed him into the ground where Defendant then kneed, punched, and kick him numerous times while he was shackled. *Id*., ¶ 198. After which, Twedt suffered a broken small finger, bruised ribs, a lacerated head, and was denied immediate medical care. *Id*., ¶ 199. When finally taken to medical, Twedt did not receive sufficient medical care or attention which led to the improper healing of his left small finger. *Id*., ¶ 200. Since then, Twedt suffers from short-term memory loss and lower functionality. *Id*., Pg. 37 ¶ 201. Thus, Defendant's prevalent policies, practices, and customs of failing to provide timely and adequate medical care, and failure-to-supervise its guards were a direct cause and moving force of Twedt's injuries. *Id*., ¶ 202.

e.   **Shane Gus Mitchell**. Defendant booked Mitchell into its jail facility. Upon information and belief, either Defendant failed to properly conduct an adequate or sufficient medical screening or Defendant had notice of Mitchell's serious medical conditions related to his blood pressure. Defendant delayed in providing Mitchell with medical care, and in or around March 2022, Mitchell died as a result. Hence, Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Mitchell's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Mitchell's death.

f.   **Kenneth Ray Harris**. On or around March 9, 2022, Defendant booked Harris into its jail facility. Upon information and belief, either Defendant failed to perform an adequate medical screening or Defendant had notice of Harris' serious medical conditions relating to his heart. After which, Defendant failed to provide Harris with timely, adequate and sufficient medical care, and on June 20, 2022, he ultimately went into cardiac arrest and died. Hence, Defendant's rampant practice and polices of understaffing and overcrowding the jail impeded Harris' access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers,

45

having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Harris' death.

g.   **Gilbert Allen Nelson**.  *See* Related Civil Action, Doc. 1, Pg. 129-130 ¶ 784-792.  On February 10, 2021, Defendant booked Nelson into its jail facility.  Thereafter, due to a lack of medical care and hygiene within Defendant's jail, Nelson contracted a urinary tract infect and did not receive proper medical treatment for this serious medical condition despite the obvious need for it.  Moreover, Defendant also did not properly monitor and observe Nelson as it did not conduct face-to-face observations to determine if he was in need of medical attention within a sufficient amount of time.  On May 11, 2022, as detention officers were not monitoring Nelson, other detainees had to inform it that Nelson was unresponsive in his bunk.  A few hours later Nelson was declared deceased with sepsis due to his untreated urinary tract infection.   Defendant's failure to provide Nelson with medication and medical attention for his known medical needs led to the deprivation of Nelson's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Nelson's dead.  Defendant's failure to properly observe and monitor Nelson and conduct proper face-to-face observations led to inadequate medical care being providing to him in a timely manner and ultimate caused Nelson's death as proper observation through face-to-face and cameras would have given the officers sufficient time to notice Nelson had become unresponsive.  Defendant's rampant practice and polices of understaffing and overcrowding the jail impeded Nelson's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff be able to perform full examinations and testing on detainee's and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Nelson's death.

h.   **Kristan Smith**.  *See* Related Civil Action, Doc. 1, Pg. 116-117 ¶ 695-703.  On April 27, 2022, Defendant booked Smith into its jail facility.  At the time, Defendant became aware that Smith had serious medical conditions, including but not limited to diabetes and high blood pressure.  Those conditions required Smith to take insulin and blood pressure medication.  Although Smith was required to take said medications, Defendant's overcrowding, understaffing, and policies of failing to provide medical care and medications led to Smith not timely receiving her medications if at all.  On May 28, 2022, other detainees informed Defendant that Smith had become unresponsive and she was declared deceased due to her disabilities

and the failure to receive her medications. Before then, Defendant had failed to properly observe and monitor her and conduct proper face-to-face observations. That led to inadequate medical provider to her, and ultimately caused her death. Defendant's failure to provide Smith with medication and medical attention for her known medical needs including diabetes and high blood pressure led to the deprivation of Smith's constitutional rights as Defendant had been deliberately indifferent to known and obvious risks that led to Smith's death. Defendant's rampant practice and policies of understaffing and overcrowding impeded Smith's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Smith's death.

i.  **Benjamin Pierce**. *See* Related Civil Action, Doc. 1, Pg. 128-129 ¶ 775-783. On May 20, 2022, Defendant booked Pierce into its jail facility. Instead of receiving a full medical screening for any health issues upon entering the jail, Pierce was placed into a solitary holding cell. Defendant was not properly monitoring and observing Pierce as it did not conduct face-to-face observations to determine if he was in need of medical attention upon being placed in a solitary cell that lacked sufficient windows or cameras to observe him. The next day, Defendant found Pierce unresponsive in his cell. Defendant's failure to provide Pierce with medication and medical attention for his known medical needs and failure to provide sufficient examination, observation, and diagnostic testing when Pierce was booked into the jail led to the deprivation of Pierce's conditional rights. Defendant was deliberately indifferent to the known and obvious risks that led to Pierce's death. Defendant's failure to properly observe and monitor Pierce and conduct face-to-face observations led to inadequate medical care provided to him in a timely manner and ultimately caused Pierce's death a proper observation through face-to-face and cameras would have given Defendant sufficient time to notice Pierce become unresponsive. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Pierce's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff to be able to perform full examinations and testing on detainees, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Pierce's death.

j.  **Robert Wayne Fore**. *See* Related Civil Action, Doc. 1, Pg. 127-128 ¶ 775-782. On May 21, 2022, Defendant booked Fore and placed him into a single cell. Three (3) days later, on May 24, 2022, Defendant got around to

conducting rounds and noticed a sheet tied around the mirror and around Fore's neck. Fore was later declared deceased at the hospital. Defendant's failure to properly observe and monitor Fore and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Fore's death as proper observation and face-to-face and cameras would have given the officers sufficient time to notice Fore using the sheet and intervene. Defendant's rampant practice and policies of understaffing and overcrowding the jails impeded Fore's access to medical care and reduced the jailer's ability to meet proper observation requirements resulting in Fore's death.

k.   **Loron Ernest Fisher**. *See* Related Civil Action, Doc. 1, Pg. 126-127 ¶ 759-768. Fisher had a serious medical condition known as sickle cell disease. On June 15, 2022, Fisher was in his cell and became in need of medical attention. Defendant, however, was not properly monitoring and observing Fisher as they did not observe him needing medical attention and were only made aware of his condition by other detainees. Upon finally getting to Fisher, Defendant took Fisher to the clinic. After three (3) hours in the clinic with only a portion of that including actual examination, Fisher was cleared and returned to his floor. Instead of placing Fisher with other detainees to allow for better observation of Fisher, Defendant placed Fisher in a holding cell that lacked sufficient windows or cameras to observe him and he died there. Defendant's failure to provide Fisher with medication and medical attention for his known medical needs including sickle cell and failure to provide sufficient examination, observation, and diagnostic testing when Fisher went to the clinic led to the deprivation of Fisher's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Fisher's death. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Fisher's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document and follow-up with known medical issues, failure to respond to requests from detainees for medical attention for days or weeks at a time, failure to have sufficient medical staff to be able to perform full examination and testing on detainees, and reduced the jailer's ability to properly observe the detainees and provide them with sufficient medical care resulting in Fisher's death.

l.   **Nathan Henderson**. *See* Related Civil Action, Doc. 1, Pg. 22-23 ¶ 104-111. Plaintiffs Shannon Piro and Dolores Smith are the mothers of Nathan Henderson. *Id*., Pg. 11 ¶ 20-21. Henderson had three children, B.H., L.H., and J.H. for whom Plaintiff Dolores brings claims. *Id*., Pg. 11-23 ¶ 21. On July 23, 2022, Defendant booked Henderson into its jail after he had been transferred from a local hospital for stab wound to his abdomen. *Id*., Pg. 22 ¶ 104. While in the hospital, the wound became infected and Defendant was

48

on notice of it. *Id*., ¶ 105. Although Henderson had been prescribed antibiotics for his infection, the Defendant failed to provide him with said medications regularly if at all in accordance with its customs, policies, and practices. *Id*., Pg. 23 ¶ 106. Defendant failed to care for Henderson's wound despite the presence of a significant known infection. *Id*., ¶ 107. On July 31, 2022, Henderson exited the shower and began to stumble, steadying himself on the railing, but as time wore on, Henderson ended up passing out and hitting his head. *Id*., ¶ 108. Days later, Henderson passed away from an infection that could have been easily kept at bay from antibiotics. *Id*., ¶ 109. Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care and systematic understaffing and overcrowding of the jail were the direct cause and moving force of Henderson's injuries. *Id*., ¶ 110.

m. **Jim Franklin Lagrone**. *See* Related Civil Action, Doc. 1, Pg. 90-91 ¶ 515-525. On July 26, 2022, Defendant booked Lagrone into its jail facility. On July 26, 2022, Defendant booked Lagrone into its jail facility. At the time, Defendant knew that Lagrone had a history of drug usage and was booked for possession of drugs. Despite this known history, Defendant failed to further screen Lagrone for medical conditions and additional treatment while in the jail. Before four (4) a.m. on July 31, 2022, Lagrone vomited into his toilet. Defendant saw it but did not provide any medical care or additional monitoring. A few hours later, Lagrone died. Defendant's failure to properly observe and monitor Lagrone and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Lagrone's death. The failure to provide Lagrone with medication and medical attention for his known medical needs including potential drug overdose led to the deprivation of Lagrone's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Lagrone's death. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Lagrone's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Lagrone's death.

n. **Damien Lavon Johnson**. *See* Related Civil Action, Doc. 1, Pg. 94-95 ¶ 550-557. On July 27, 2022, Defendant booked Johnson into its jail facility. On November 13, 2022, Johnson was left unobserved and unmonitored by jail staff for a significant and unreasonable period of time. During which time, Johnson tied a sheet in his cell, placed it around his neck, and hung himself. Defendant then delayed in providing him with medical care, and on November 15, 2022, Johnson was declared dead. With actual proper face-to-face observations, Defendant would have observed Johnson attempt to use the sheet or seen him hanging with sufficient time to render aid or medical attention which would have prevented his death. Defendant's failure to properly observe and monitor Johnson and conduct proper face-to-face observations led to inadequate medical care being provided to him

in a timely manner and ultimately caused Johnson's death. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Johnson's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Johnson's death as there was insufficient staff to handle the necessary functions of the jail let alone monitor the thousands of inmates even with the minimum required number of officers.

o.    **Arlen Ashley Bates**. On June 20, 2022, Bates was arrested for possession of a controlled substance and was transported to Memorial Herman Southwest Hospital. After which, three (3) days later on June 22, 2023, Bates was booked into Defendant's Harris County Jail where Defendant's Sheriff's Office deputies assumed care, custody, and control. Two (2) days later, Bates died. Upon information and belief, Defendant failed to follow proper medical care instructions, provide medications, and conduct proper/timely face-to-face observations. So too did Defendant's understaffing and overcrowding of the jail impede Bates access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Bates' death as there was insufficient staff to handle the necessary functions of the jail let alone monitor the thousands of inmates even with the minimum required number of officers.

p.    **James Earl Gamble**. *See* Related Civil Action, Doc. 1, Pg. 91-92 ¶ 526-535. On August 26, 2021, Defendant booked Gambel into its jail facility. While in jail, Gamble did not receive medical screenings, care or medication for his serious medical conditions including hypertension. On August 25, 2022, other detainees informed Defendant that Gamble was unresponsive in his bunk. Defendant had not properly observed him as unresponsive. After taking Gamble to the clinic, the Houston Fire Department was called and took him to LBJ Hospital where Gamble was declared deceased. Defendant's failure to provide Gamble with medical attention for his known medical needs including hypertension led to the deprivation of Gamble's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Gamble's death. Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Gamble's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Gamble's death.

q.    **Victoria Margaret Simon**. *See* Related Civil Action, Doc. 1, Pg. 92-93 ¶ 536-542. On September 29, 2022, Defendant booked Simon into a single quarantine cell. In which, she did not receive adequate medical care. On October 2, 2022, Defendant finally got around to conducting a tuberculosis test, but found Simon unresponsive. After being transported to the clinic, Simon was pronounced dead by the jail's doctor. Defendant's failure to properly observe and monitor Simon and conduct face-to-face observations led to inadequate medical care being provided to her in a timely manner and

ultimately caused Simon's death.  Defendant's rampant practice and policies of understaffing, overcrowding and failure to train/supervise impeded Simon's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Simon's death.

r.    **Robert Alfred Horn**.  On or around October 24, 2022, Defendant booked Horn into its jail facility.  Two (2) days later, during another booking process, the decent suffered a medical emergency while sitting in a chair. Upon information and belief, Defendant had either previously failed to adequate screen Horn for any serious medical conditions or was aware that he had one but failed to provided adequate, timely and sufficient care. Moreover, upon information and belief, following the medical emergency Defendant failed to timely provide medical care and Defendant died as a result.  Hence, Defendant's rampant practice and policies of understaffing, overcrowding and failure to train/supervise impeded Simon's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Horn's death.

s.    **Taylor Euell (First Incidents)**.  *See* Related Civil Action, Doc. 1, Pg. 42-43 ¶ 233-239 / Pg. 158-159 ¶ 927-930 / Pg. 185-186 ¶ 1040-1042.  Euell is a Plaintiff in this lawsuit, and resides in Harris County.  *Id*., Pg. 12 ¶ 24.  On September 28, 2022, Defendant booked Euell into its jail facility, and at the time, became aware of his known history of serious mental and physical conditions which required him to receive medications for seizures.  *Id*., Pg. 42 ¶ 234.  On September 29, 2022, an officer beat Euell up, and Euell sought medical treatment for his serious injuries.  *Id*. ¶ 235-236.  Defendant, however, did not properly treat Euell's broken hand, and his bone grew back improperly.  *Id*. ¶ 236.  Over the next several weeks and months, Euell's vision began to blur, prompting him to tell his wife that he had submitted to the Defendant several requests for medical attention but that the only attention he ever received after several weeks was a short evaluation by a general doctor and not an eye doctor. *Id*. ¶ 237.  During this time, Defendant had also failed to provide Euell with his seizure medications consistently if at all.  *Id*. ¶ 238.  Moreover, Euell would go to the clinic several times with dangerously high blood pressure, only for the Defendant to keep taking readings until a normal one was obtained rather than actually providing Euell with medications or to properly treat it.  *Id*.  Defendant's failure to provide him with his medications led to a breakthrough seizure on or around January 27, 2023.  *Id*., Pg. 42-43 ¶ 238.  This seizure would not have occurred had Euell received his medications consistently.  *Id*., Pg. 43 ¶ 238. And, during it, rather than providing Euell with medical care, Defendant stomped on Euell's wrists and ankles.  *Id*. ¶ 239.  Thus, due to the actions, policies, practices, and customs of Defendant, Euell has suffered significant injuries to his hand and eyes as well as increased compliances and injuries from seizures.  *Id*., 243.  Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and

51

adequate medical care, systematic understaffing, overcrowding, and failure-to-train and supervise were each moving forces behind Euell's injuries. *ID*., Pg. 43-44 ¶ 244.

t.   **Alan Christopher Kerber**.   *See* Related Civil Action, Doc. 1, Pg. 93-94 ¶ 543-549.   On October 9, 2022, Defendant book Kerber into a single quarantine cell which lacked proper observation and monitoring.  Three (3) days later, Defendant eventually found Kerber unresponsive with a tube of toothpaste stuck in his throat.  After which, Defendant delayed in providing medical care.  Moreover, Defendant had also left Kerber unmonitored for a significant period of time.  If Defendant had, however, properly observed and monitored Kerber, Defendant would have seen him attempting to harm himself and/or seen him become unresponsive within enough time to render aid that would have prevented his death.  Defendant's failure to properly observe and monitor Kerber and conduct proper face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Kerber's death.  Defendant's rampant practice and policies of understaffing and overcrowding impeded Kerber's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Kerber's death.

u.   **Dylan Perio**.   *See* Related Civil Action, Doc. 1, Pg. 45-46 ¶ 254-261 / Pg. 166-167 ¶ 963-966 / Pg. 193 ¶ 1067-1069.  Perio is a plaintiff in this lawsuit residing in Harris County.  *Id*., Pg. 12 ¶ 34.  In or around November 2022, Defendant booked Perio into its jail facility.  *Id*., Pg. 45 ¶ 245.  At the time, Defendant became aware that Perio had a known chronic and serious medical condition (i.e., HIV).  *Id*.  Given so, Defendant was notice that Perio needed to stay on his medications other he would suffer significant physical injuries and a setback in his condition.  *Id*. ¶ 255.  Unfortunately, for almost a year, Period was not provided his medications for his illness which resulting in him suffering a relapse in his condition.  *Id*. ¶ 256.  Despite asking for medical care numerous times, Perio was not provided with the medical attention that he needed.  *Id*. ¶ 257.  Perio put Defendant on notice that his complaints were being ignored, but those complaints too were ignored.  *Id*.  Eventually, in July 2023, Perio saw a medic in the jail who informed him that his organs were beginning to shut down due to the failure to get his medications consistently.  *Id*. ¶ 258.  That, if Perio did not receive immediate medical attention, his organs would completely shut down and result in his death.  *Id*., Pg. 45-46 ¶ 258.  Although having been previously denied or delayed, Perio was finally provided with medications for his condition. *Id*., Pg. 46 ¶ 258.  However, this medication was unable to reverse the permanent damages to Perio's body that months of lack of medical care had caused him.  *Id*.  Due to the actions, policies, practices, and customs of the Defendant, Perio suffered significant injuries to his physical condition as well as increased complications and injuries from his medical condition.  *Id*., 259.  Defendant's prevalent policies, practices, and customs of failing

to provide timely and adequate medical care and systemic understaffing and overcrowding as well as the failure-to-train and failure-to-supervise were moving forces behind Perio's injuries. *Id*. ¶ 260.

v.   **Michael Griego**.  *See* Related Civil Action, Doc. 1, Pg. 95-96 ¶ 558-567. On November 13, 2022, numerous detainees in Defendant's custody attacked Griego while Defendant watched.  Defendant, however, did not interfere until after the beating had stopped and Griego was unconscious. Given so, Defendant delayed in providing Griego with medical care for his serious injuries which included visible head trauma.  Eventually, Griego was transported to the hospital where he succumbed to his injuries on November 22, 2022 and died.  Defendant's failure to properly observe and monitor Griego and the detainees in and around his cell and conduct proper face-to-face observations led to inadequate protection from the other inmates and inadequate medical care being provided to him in a timely manner and ultimately caused Griego's death.  Defendant's rampant practice and policies of understaffing and overcrowding the jail impeded Griego's access to medical care and reduced the jailer's ability to properly observe the detainees resulting in Griego's death.

w.   **William Curtis Barrett**.  *See* Related Civil Action, Doc. 1, Pg. 18-19 ¶ 77-85 / Pg. 153-154 ¶ 907-910 / Pg. 180-181 ¶ 1025-1027.  Plaintiff Annette James is the sister, heir, and representative of the heirs of Barett.  *Id*., Pg. 11 ¶ 19.  On November 17, 2022, Defendant booked Barrett into its jail facility, and then became aware of Barrett's mental health issues for which he received medications.  *Id*., Pg. 18 ¶ 77.  Defendant put Barrett into a single person cell despite his known mental health issues and the known damage that solitary confinement can have on the psychological disposition of detainee with his disability.  *Id*., Pg. 19 ¶ 78.  At some point thereafter, other detainees assaulted Barrett, and Barrett suffered significant and noticeable trauma to his head.  *Id*. ¶ 80.  Despite these visible injuries, Defendant did not provide Barrett with sufficient medical evaluation or treatment.  *Id*. ¶ 81.  Thereafter, on November 20, 2022, despite knowing of Barrett's injuries, Defendant did not conduct consistent or timely observations or monitoring of Barett, and he died.  *Id*. ¶ 82-83.  Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, systematic understaffing and overcrowding as well as the failure-to-train and failure-to-supervise were all moving forces behind Barrett's injuries.  *Id*. ¶ 84.

x.   **Adael Gonzalez Garcia**.  *See* Related Civil Action, Doc. 1, Pg. 104-106 ¶ 617-626.  In or around November 25, 2022, Garcia allegedly fell from his cell bunk and was taken to the jail for examination.  Defendant, however, failed to conduct proper face-to-face or camera monitor, and as such, delayed in proving Garcia with medical care.  Alternatively, "falling off of a bunk" is a common excuse created by guards and detainees for detainee's

injuries to cover up for an officer's use of force and assault of an inmate. And, if that happened, upon information and belief, Defendant delayed in providing medical care to Garcia after it. After care was eventually provided, the next day on November 26, 2022, while being escorted back from the clinic, Defendant's guards assaulted Garcia and then failed to adequately provide him with immediate medical care. Garcia then went into a coma. Garcia, however, was never charged with assaulting an officer which is very unusual in Harris County when an inmate is beaten by an officer. As of February 13, 2023, Garcia is still in the hospital with a coma. Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, systematic understaffing and overcrowding as well as the failure-to-train and failure-to-supervise were all moving forces behind Garcia's injuries.

y.   **Harrell Veal**. *See* Related Civil Action, Doc. 1, Pg. 32-33 ¶ 171-177 / Pg. 161-162 ¶ 939-942 / Pg. 188 ¶ 1049-1051. Harrell Veal is a plaintiff in this lawsuit, and resides in Harris County. *Id*., Pg. 12 ¶ 27. A few months after January 23, 2022 but before December 24, 2022, Defendant failed to and delayed to provide Veal with his blood pressure medications which were prescribed to him to help him control a serious medical condition known as high blood pressure. *Id*., Pg. 32 ¶ 171, 173-174. Defendant's policies, practices, and customs, singularly and taken together of failing to provide medical care and medications for Veal's known medical needs and injuries incurred while in jail, the failure to provide proper observation and monitoring of Veal to provide timely medical care and continuous overcrowding and understaffing of the jail impeded Veal's access to medical care, and reduced the jailer's ability to observe Veal and were moving forces behind Veal's injuries. *Id*., Pg. 161 ¶ 939. Absent these policies, practices, and customs, Defendant would have or should have provided proper medical care, proper observation and monitoring, and would have had sufficient staff and a limited number of detainees that would have prevented Veal's injuries. *Id*., ¶ 940. It was highly predictable that Defendant's employees would follow those ongoing policies and practices, the known and obvious consequences of which would cause Veal's injuries. *Id*., ¶ 941. The DOJ, TCJS, and even the Sheriff all had notice of these policies and the likely consequences of them would cause constitutional violations. *Id*. Defendant acted with deliberate, callous, conscious, and unreasonable indifference to Veal's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continued to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Veal's injuries. *Id*., Pg. 162 ¶ 942.

z.   **Jacoby Pillow**. *See* Related Civil Action, Doc. 1, Pg. 14-15 ¶ 45-55 / Pg. 157 ¶ 923-926 / Pg. 184-185 ¶ 1037-1039. Plaintiff Octavia Wagner is the sister and heir of Pillow, and represents his remaining heirs. *Id*., Pg. 11 ¶ 12. On January 1, 2023, Defendant took custody of Pillow. *Id*., ¶ 45. After

posting a $100 bond, Pillow should have been released but instead he was inexplicably kept in a medical holding cell.  *Id*., ¶ 46-47.  As it turned out, several officers had assaulted Pillow causing him blunt force trauma to his head, back, and extremities.  *Id*. ¶ 48.  Moreover, Defendant's officers also placed their weight onto Pillow's chest and back which prevented him from breathing properly.  *Id*.  Despite the severity of these injuries, Defendant only conducted a mere cursory evaluation and cleared Pillow.  *Id*.  In his cell, Pillow suffered in pain and did not receive further medical attention.  *Id*. ¶ 49.  Moreover, Defendant did not check on Pillow for several hours violating numerous minimum standards.  *Id*. ¶ 51.  Eventually, on or around January 3, 2023, Defendant found Pillow unresponsive in his cell after which time Pillow passed away shortly after arriving at the hospital.  *Id*., Pg. 15 ¶ 52.  Now, the FBI is investigating the Defendant in regards to Pillow's death.  *Id*., Pg. 101 ¶ 600.  And, shortly after Pillow's death, Shannon Herklotz who served as the Assistant Chief of Detentions with the Defendant submitted his resignation letter.  *Id*., Pg. 146 Now, the FBI is investigating the Defendant in regards to Pillow's death.  *Id*., Pg. 101 ¶ 600. 882.  In it, he cited numerous issues within the jail that they were seeking to overcome including overcrowding and staffing deficiencies.  *Id*.  Defendant's policies, practices, and customs, singularly and taken together, of failing to provide medical care and medications for Pillow's known medical needs and injuries incurred while in the jail, the failure to provide proper observation and monitoring of Pillow to provide timely medical care, the continuous overcrowding and understaffing of the jail, and the failure to-train and failure-to-supervise all impeded Pillow's access to medical care and were the moving forces behind Pillow's injuries.  *Id*., Pg. 157 ¶ 923. Absent these policies, practices, and customs, Defendant would have or should have provided proper medical care, proper observation and monitoring, and would have had sufficient staff and a limited number of detainees that would have prevented Pillow's injuries and death.  *Id*.  Now, the FBI is investigating the Defendant in regards to Pillow's death.  *Id*. ¶ 924.  It was highly predictable that Defendant's employees would follow these ongoing policies and practices, the known and obvious consequences of which were that the detainees would suffer significant injuries and death. *Id*. ¶ 925.  The DOJ, TCJS, and even the Sheriff have all provided notice of these policies and the likely consequences of the same causing constitutional violations.  *Id*.  Defendant acted with deliberate, callous, conscious, and unreasonable indifference to Pillow's constitutional rights by being aware of the known and obvious consequences of their policies and practices but continued to authorize, tolerate, and ratify the implementation of the custom and practice resulting in Pillow's death.  *Id*., Pg. 157 ¶ 926.

aa.  **Gary Wayne Smith**.  *See* Related Civil Action, Doc. 1, Pg. 24-25 ¶ 121-128 / Pg. 150-151 ¶ 895-898 / Pg. 178-179 ¶ 1016-1018. Plaintiff Gabrielle Smith is a daughter and heir of Smith, and is a resident of Harris County.

*Id.*, Pg. 11 ¶ 13.  Plaintiff Dwanna Johnson is the mother and next of friend of A.J., a minor and the daughter of Smith, and both are residents of Harris County.  *Id.*, ¶ 14.  On December 6, 2022, Defendant booked Smith into its jail facility, and at that time became aware of Smith's serious medical conditions which included kidney disorder, a disease that requires consistent medication, medical treatment and observation.  *Id.*, Pg. 24 ¶ 121-122.  Defendant, however, placed Smith into a single cell that lacked measures to provide sufficient observation and monitoring in light of his serious medical condition.  *Id.*, Pg. 25 ¶ 123.  Despite being transported to and from the hospital numerous times over the period of one month, Smeith was not placed permanently in a hospital or sufficient medical facility for continuous observation and care in light of his going condition serious medical condition.  Id. ¶ 124.  On January 10, 2023, after some time, Defendant found Smith unresponsive in his cell.  *Id.* ¶ 125.  Although Smith was within a holding cell inside the infirmary portion of the jail, Smith was not provided with sufficient observation and medical care including the failure to provide medications necessary for his treatment or sufficient testing for ongoing medical issues.  *Id.*, ¶ 126.  Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were direct and moving forces behind Smith's injuries and death.  *Id.* ¶ 128.

bb.  **Kevin Leon Smith, Jr.**  *See* Related Civil Action, Doc. 1, Pg. 20-21 ¶ 86-94 / Pg. 165 ¶ 955-958 / Pg. 191-192 ¶ 1061-1063.  Plaintiffs Tracey Woodson-Smith and Kevin Smith are the parents of Smith, and reside in Harris County.  *Id.*, Pg. 12 ¶ 32-33.  On July 1, 2022, Defendant booked Smith into its jail facility with known serious medical conditions.  *Id.*, Pg. 20 ¶ 86.  Defendant did not provide Smith with his medication and failed to provide him with proper treatment and/or medical diagnostic testing for his medication condition.  *Id.* ¶ 87.  On or around January 31, 2023, Smith suffered a medical emergency in his cell.  *Id.* ¶ 88.  Defendant, however, had not been properly observing or monitoring Smith, and other detainees had to inform Defendant of Smith's situation.  *Id.*  Some of the trustees who were working in the clinic were required to get a stretcher even though they were not employees of the jail.  *Id.* ¶ 89.  Although the trustees were prepared to head to the cell, Defendant's medical staff stood around the clinic for several minutes joking about unrelated topics.  *Id.*  Eventually, the trustees and medical staff headed to Smith's pod and when they arrived four to five (4-5) officers ran out of the pod in a hurry.  *Id.*  In the pod, five to six (5-6) more officers and the sergeant were in the room looking at Smith in his top bunk, and everybody knew that Smith was unresponsive but nobody was attempting to get Smith to the ground to do CPR or other life saving measures.  *Id.* ¶ 90.  Instead, the officers were simply stating that Smith was "faking" it.  *Id.*  Eventually, the trustees got Smith onto the back board and took him to the elevator, but no CPR was conducted and medical

56

staff simply stood by and did not provide any assistance. *Id*. Smith's fingers, lips, and face were already blue prior to even entering the elevator, and once in the elevator, an officer reluctantly began giving compressions but refused to let anyone give breathes or provide a breathing apparatus. *Id*. ¶ 91. When they finally arrived at the clinic, an AED was retrieved but it was not charged. *Id*. The clinic for the entire jail only had one AED. *Id*. Later that day, Smith was declared dead. *Id*., Pg. 21 ¶ 92. Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were a direct cause and moving force of Smith's injuries and death. *Id*. ¶ 93.

cc.    **John Maxey**. Defendant had Maxey in its custody at its jail facility. Upon information and belief, Defendant denied Maxey proper adequate, sufficient, and timely medical care for a serious medical condition, colon cancer, and Maxey died as a result in or around November 2022. Defendant's prevalent policies, practices, and customs of failing to provide timely and adequate medical care, systematic understaffing and overcrowding as well as the failure-to-supervise and failure-to-train were the direct causes and moving forces of Maxey's injuries.

dd.    **Jeremiah Anglin**. *See* Related Civil Action, Doc. 1, Pg. 31 ¶ 163-170 / Pg. 163 ¶ 947-950 / Pg. 189-190 ¶ 1055-1057. Anglin is a plaintiff in this lawsuit and resides in Harris County. *Id*., Pg. 12 ¶ 29. On November 28, 2022, Defendant booked Anglin and was aware of his serious medical and mental condition (i.e., schizophrenia). *Id*., Pg. 31 ¶ 164. Even though Defendant knew that Anglin had known mental disabilities, Defendant put Anglin in the general population of the jail instead of in the mental health ward. *Id*. ¶ 164. Moreover, Defendant did not regularly provide Anglin with his medications if at all. *Id* ¶ 165. On or around February 1, 2023, Defendant inexplicably began kicking Anglin in the face and then delayed in providing him with medical care. *Id*. ¶ 166. As a result, Anglin lost six (6) of his teeth and had significant swelling all over his head. *Id*. ¶ 167. When Anglin finally received medical care, the doctors had to place multiple screws in his month. *Id*. ¶ 168. Defendant's prevalent policies, practices, and customs of failing to provide timely and adequate medical care, systematic understaffing and overcrowding as well as the failure-to-supervise and failure-to-train were the direct causes and moving forces of Anglin's injuries. *Id*. ¶ 169.

ee.    **John Coote**. *See* Related Civil Action, Doc. 1, Pg. 33-35 ¶ 178-191 / Pg. 160-161 ¶ 935-938 / Pg. 187-188 ¶ 1046-1048. Coote is a plaintiff in this lawsuit, and resides in Harris County, Texas. *Id*., Pg. 12 ¶ 26. On February 1, 2023, Defendant booked Coote into its jail facility. *Id*., Pg. 33 ¶ 178. On February 7, 2023, Defendant viciously beat Coote to the ground in an area (i.e., the vestibule) known to not have cameras. *Id*. ¶ 180-181. One of

57

Defendant's officers punched Coote in the head and face six (6) times. *Id*. ¶ 181. Five (5) of these punches came while Coote was lying on the ground with numerous officers on top of him shackling his arms and legs. *Id*. Moreover, Coote was sprayed in the face three (3) different time with pepper spray. *Id*. ¶ 182. As a result, Coote lay on the ground with his lips and eyes swollen with noticeable bruising on his head. *Id*. Thereafter, upon information and belief, the officers then delayed in providing Coote with medical care. When Cootie was eventually taken to the clinic, he received only slight care for his injuries even though he had considerable facial bruising, a broken nose, and difficulty breathing. *Id*. ¶ 183. The next day, on February 8, 2023, Defendant allowed other detainees to viciously beat Cootie as well. *Id*. ¶ 184. After which, upon information and belief, Defendant delayed in providing Coote with medical care. Consequently, Coote suffered from a broken foot, a still broken nose, bruised shoulder, and still swollen face. *Id*. ¶ 185. Defendant, however, only cursorily treated these injuries. After which, Defendant again allowed Coote to be viciously beat by other detainees again. *Id*. ¶ 186. Upon information and belief, Defendant again delayed in providing medical care. As a result, Coote suffered from brain trauma. *Id*. Thereafter, on February 10, 2023, Defendant again viciously beat Coote by slamming his head against the concrete walls and floors and then punched him several times causing him to have a split lip and his previous injuries were aggravated. *Id*. ¶ 188. Upon information and belief, Defendant delayed in providing medical care. Now, Coote walks with a limp. *Id*. ¶ 189. Hence, Defendant's prevalent policies, practices, and customs of failing to timely and adequately provide medical care, and systematic understaffing and overcrowding of the jail as well as the failure-to-supervise and failure-to-train were the direct causes and moving forces of Coote's injuries. *Id* ¶ 190.

ff.   **Christopher Young**. *See* Related Civil Action, Doc. 1, Pg. 44-45 ¶ 246-253 / Pg. 159 ¶ 931-934 / Pg. 186 ¶ 1043-1045. Young is a Plaintiff in this lawsuit, and resides in Harris County, Texas. *Id*., Pg. 12 ¶ 25. On February 11, 2023, detainee Young walked into the bathroom, and several minutes to a few hours later, a detainee informed Defendant that Young was in the bathroom with head split open. *Id*., Pg. 44 ¶ 247. Young suffered from injuries that were not consistent with a face, and which required multiple surgeries and that several mental plates be installed within him. *Id*. ¶ 248. Moreover, Young suffered from a lacerated ear and loss of vision in his left eye. *Id*. Upon information and belief, Defendant delayed in providing Young with medical care. Indeed, Defendant left Young to lie on the floor in significant pain and in his own blood for a considerable amount of time because the Defendant did not conduct sufficient face-to-face observations and monitoring of Young. *Id*. ¶ 251. Hard Defendant conducted proper and timely monitoring, Defendant would have found Young sooner and could have provided him with medical care sooner. *Id*., Pg. 44-45 ¶ 251. Thus, Defendant's prevalent policies, practices, and customs of failing to observe

58

and monitor detainees, systematic understaffing and overcrowding the jail were the direct cause and moving force of Young's injuries. *Id.*, Pg. 45 ¶ 252.

gg. **Jaquez Moore (First Incidents)**. *See* Related Civil Action, Doc. 1, Pg. 39-41 ¶ 219-227 / Pg. 155-156 ¶ 915-918 / Pg. 182-183 ¶ 1031-1033. Moore is a plaintiff in this lawsuit, and resides in Harris County, Texas. *Id.*, Pg. 12 ¶ 22. In November 2022, Defendant booked Moore into its jail facility, and obtained notice that Moore had a history of seizures due to a brain injury and also had epilepsy. *Id.*, Pg. 39 ¶ 219. Even though Moore had medications when he entered the jail to control his seizures and symptoms from his brain injury, Defendant would not provide Moore with his medications routinely if at all. *Id.*, Pg. 40 ¶ 220. Defendant, instead, would withhold Moore's medications as a punishment to him for any type of perceived slight. *Id.* On February 13, 2023, Defendant allowed Moore to be attacked by other detainees. *Id.* ¶ 221. As a result of the attack, Moore had a seizure because he had been hit on the head where he had a metal plate. *Id.* ¶ 222. More than thirty (30) minutes passed before Defendant even bothered to respond or provide medical care. *Id.* ¶ 223. Instead of taking Moore to the clinic to be treated, Defendant placed him in a punishment cell which routinely contains feces and other filth and lacks camera coverage. *Id.* ¶ 224. Eventually, Defendant took Moore to medical where he was put in a holding cell for eight (8) hours and given Pedialyte and little pain medicine. *Id.* ¶ 225. Defendant, however, did not provide Moore with a thorough evaluation nor did it test for his injuries including ruling out potential long-term brain injuries. *Id.* Throughout his time in jail, Moore would be attacked in blind spots where there were no cameras, and Defendant would delay in providing him with medical care. *Id.*, Pg. 40-41 ¶ 226. Thus, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical, systemic understaffing and overcrowding of the jail as well as the failure-to-train and failure-to-supervise were direct causes and moving forces behind Moore's injuries. *Id.* Pg. 41 ¶ 231.

hh. **Taylor Euell (Second Incidents)**. *See* Related Civil Action, Doc. 1, Pg. 43-44 ¶ 240-245 / Pg. 158-159 ¶ 927-930 / Pg. 185-186 ¶ 1040-1042. Euell is a Plaintiff in this lawsuit, and resides in Harris County. *Id.*, Pg. 12 ¶ 24. On or around February 2, 2023, Euell reported to Defendant that other detainees had threatened to sexually assault him. *Id.*, Pg. 43 ¶ 240. Instead of transferring Euell or conducting additional observations to prevent any assault from happening, Defendant stated that they would not do anything to help Euell until he was actually sexually assaulted. *Id.* After which, the other immediate attempted to sexually assault Euell, and while Euell tried to defend himself, the other inmate punched him in the face and broke his nose. *Id.* ¶ 241. The punch impaired the vision in Euell's eye. *Id.* After which, Defendant failed to provide Euell with medical treatment for his

59

broken nose or eye. *Id*. ¶ 242. Weeks later, Euell was finally seen by a doctor who stated that his nose had healed incorrectly and that the Defendant should have taken Euell to the hospital as soon as the assault had happened. *Id*. Now, Euell has a deformed nose. *Id*. Thus, due to the actions, policies, practices, and customs of Defendant, Euell has suffered significant injuries. *Id.* ¶ 243. Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, systematic understaffing and overcrowding of the jail were the direct cause and moving forces behind Euell's injuries. *Id.*, Pg. 43-44 ¶ 244.

ii.   **Fabien Cortez**. *See* Related Civil Action, Doc. 1, Pg. 134-135 ¶ 819-827. On March 21, 2023, Defendant was processing Cortez into its jail facility, and allowed Cortez to go to the restroom. *Id*., Pg. 134-135 ¶ 819-820. In accordance with Defendant's customs, policies, and practices, Defendant failed to observe, monitor, or conduct face-to-face observations with Cortez for at least eighty-eight (88) minutes. *Id*., Pg. 135 ¶ 821. In the restroom, Cortez became in need of medical attention, but Defendant failed to provide it. On April 17, 2023, the Texas Commission on Jail Standards, as laid out below, found that Defendant had violated minimum jail standards by failing to conduct face-to-face observations with Cortez for over eighty-eight (88) minutes. *Id*. ¶ 824. This led to a severe constitutional violation as Cortez was given more than enough time to hang himself, and the lapse in time prevented timely medical care. *Id*. ¶ 824. Defendant's failure to properly observe and monitor Cortez and conduct face-to-face observations led to inadequate medical care being provided to him in a timely manner and ultimately caused Cortez's death. *Id*. ¶ 825. Defendant's rampant practice and policies of understaffing and overcrowding impeded Cortez's access to medical care, impeded providing medical care timely, and reduced the jailer's ability to properly observe the detainees resulting in Cortez's death. *Id*. ¶ 826.

jj.   **Jeremy Garrison**. *See* Related Civil Action, Doc. 1, Pg. 25-27 ¶ 129-142 / Pg. 170-171 ¶ 979-982 / Pg. 196-197 ¶ 1079-1082. Garrison is a plaintiff in this lawsuit, and is an individual residing in Harris County, Texas. *Id*., Pg. 13 ¶ 38. Garrison was detainee in Defendant's custody. *Id*., Pg. 25 ¶ 129. On or around April 23, 2023, Defendant viciously beat Garrison up, and upon information and belief delay or failed to provide him with adequate and sufficient medical care afterwards. *Id*., Pg. 25 ¶ 130. On May 20, 2023, Defendant sprayed Garrison with pepper spray because he peacefully and calmly asked to speak to the sergeant. *Id*., Pg. 26 ¶ 131-133. Thereafter, Garrison was punched in face after he complied with an officer's command. *Id*. ¶ 135. After Garrison fell to the floor, Defendant viciously beat him excessively. *Id*. Instead of taking pictures of the blood, Defendant quickly cleaned it up. *Id*., Pg. 27 ¶ 135. After which, upon information and belief, Defendant delay in providing Garrison with adequate medical care.

Consequently, Garrison suffered from a "hangman's" facture of his neck, and was lucky to be alive and not paralyzed. *Id*. ¶ 137. In addition to a broken neck, Garrison suffered extreme bruising, head trauma, lacerations to multiple areas of his body, loss of consciousness, visual changes, and loss of strength and use in his right hand as a direct result of Defendant's actions. *Id*. ¶ 138. Consistent with Defendant's policies and practices, its officers falsified the report of the incident to the medical providers, and wrote that only pepper spray was involved. *Id*. ¶ 139. The doctors, however, knew that statement was false in light of Garrison's injuries, and rejected this story and determined that the officers had assaulted Garrison causing the above injuries. *Id*. ¶ 139. Due to the actions, policies, practices and customs of Defendant, Garrison suffered significant injuries to his head, neck and arms. *Id*. ¶ 140. Defendant's prevalent policies, practices, and customs of institutionalizing excessive force by jail employees on detainees and systemic understaffing and overcrowding of the jail were the direct cause and moving force of Garrison's injuries. *Id*., Pg. 28 ¶ 141.

kk.   **Kenneth Richard**. *See* Related Civil Action, Doc. 1, Pg. 29-31 ¶ 153-162 / Pg. 164 ¶ 951-954 / Pg. 190-191 ¶ 1058-1060. Richard is a plaintiff in this lawsuit, and is a resident of Montgomery County, Texas. *Id*., Pg. 12 ¶ 30. On April 22, 2023, Defendant booked Richard into its jail facility, and had notice that Richard had a serious medical condition known as anxiety for which he was taking medication. *Id*., Pg. 29 ¶ 153. On or around April 27, 2023, Richard had an anxiety attack due to Defendant's failure to provide him with his medications regularly. *Id*. ¶ 154. Richard complained to his mother about the terrible conditions at the jail over the phone. *Id*., Pg. 30 ¶ 155. While in the clinic and while waiting to receive care, Defendant came and put Richard in handcuffs and leg shackles which had never been done to him previously. *Id*. ¶ 30. Thereafter, Richard was pushed into a cell with Defendant telling him to not talk to his mother anymore. *Id* ¶ 157. A few minutes later, Defendant came back with more officers and viciously beat Richard, during which time they stomped on him and kick him for several minutes. *Id*. ¶ 158. After which, upon information and belief, Defendant delayed in providing Richard with medical care. Richard lost consciousness and was then eventually taken to the hospital with severe head injuries, injuries to his back and chest, blurred vision, memory loss, numbness in his extremities, and PTSD. *Id*. ¶ 159. Moreover, Richard had also lost skin around his ankles and wrists where the shackles had been when he was beaten up. *Id*. When Richard was in the hospital, his injuries required him to be intubated while he was unconscious. *Id*. ¶ 160. Hence, Defendant's prevalent policies, practices, and customs of failing to provide timely and adequate medical care, systemic understaffing and overcrowding of the jail were the direct cause and moving force of Richard's injuries. *Id*. ¶ 161.

ll.   **Jaquez Moore (Second Incidents)**. *See* Related Civil Action, Doc. 1, Pg. 41 ¶ 228-231 / Pg. 155-156 ¶ 915-918 / Pg. 182-183 ¶ 1031-1033. Moore

is a plaintiff in this lawsuit, and resides in Harris County, Texas. *Id*., Pg. 12 ¶ 22. Defendant booked Moore into its jail facility, and had notice that he had a history of seizures due to a brain injury and also had epilepsy. *Id*., Pg. 39 ¶ 219. In May 2023, Defendant allowed Moore to be attacked while he was walking back from the commissary. *Id*., Pg. 41 ¶ 228. After which, upon information and belief, Defendant delayed in providing Moore with adequate and sufficient medical care. Consequently, Moore suffered an eye injury. *Id*. Throughout Moore's time in jail and specifically in regard to this eye injury, Moore requested medical attention but these requests were either ignored or were not accepted until a long and unreasonable period of time had passed. *Id*. ¶ 229. The medical kiosk on Moore's floor was broken which also prevented Moore from making medical requests. *Id*. While Defendant stated that it would be fixed, it was not fixed for several weeks. *Id*. Consequently, Moore suffered from continuous constitutional rights violations and also suffered significant injuries including memory loss, seizures, blurred vision and pain and suffering. *Id*. ¶ 230. Hence, Defendant's culture of violence and prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical, systemic understaffing and overcrowding of the jail as well as the failure-to-train and failure-to-supervise were direct causes and moving forces behind Moore's injuries. *Id*. ¶ 231.

mm.  **Robert Terry, Jr.**  *See* Related Civil Action, Doc. 1, Pg. 133-134 ¶ 811-818. On May 13, 2023, Defendant booked Terry into its jail facility. *Id*., Pg. 133 ¶ 811. On May 16, 2023, Terry pressed the intercom button in a multi-occupancy cell, fell to the floor clutching his stomach, began to foam at the mouth, and tried crawling to the dayroom. *Id*. ¶ 812. Defendant, however, failed to notice Terry's initial need for medical attention, and it took ninety (90) minutes for medical personnel to arrive during which time the jailers stood around, laughed and taunted Terry. *Id*., Pg. 134 ¶ 813. Terry then passed away later that morning. *Id*. ¶ 814. Hence, Defendant's failure to provide Terry with medication and medical attention for his known medical needs and instead laughing and taunting him for ninety (90) minutes led to the deprivation of Terry's constitutional rights by being deliberately indifferent to the known and obvious risk that led to Terry's death. *Id*. ¶ 815. Defendant's failure to properly observe, monitor, and intervene for Terry led to inadequate medical care being provided to him in a timely manner and ultimately caused Terry's death. *Id*. ¶ 816. Defendant's rampant practice and polices of understaffing and overcrowding the jail impeded Terry's access to medical care, including not having sufficient staff to pass out medications resulting in medications either not being issued or certain detainees being skipped by rushed officers, having staff fail to properly document, screen, and/or follow up with known medical issues, failure to have sufficient medical staff to respond quickly to medical emergencies, failure to have sufficient medical staff to be able to perform full examinations and testing on detainee's, and reduced the jailer's

ability to properly observe the detainees and provide them with sufficient medical care resulting in Terry's death. *Id*., Pg. 134 ¶ 817.

nn. **Antonio Radcliff**. *See* Related Civil Action, Doc. 1, Pg. 37-38 ¶ 204-211 / Pg. 169-170 ¶ 975-978. Radcliff is a plaintiff in this lawsuit, and resides in Harris County, Texas. *Id*., Pg. 12 ¶ 37. On March 7, 2023, Defendant booked Radcliffe into its jail, and he was a trustee tasked with serving meals in other area of the jail. *Id*., Pg. 37 ¶ 204-205. On or around May 18, 2023, Radcliffe was serving food with two other detention officers when another detainee came and attacked Radcliffe. *Id*. ¶ 206. Defendant's two officers could have easily prevented or intervened in the assault, but were deliberately indifferent to the known and obvious risks to Radcliffe's person and intentionally chose to not interfere. *Id*. Following the attack, Radcliff notified Defendant that his jaw felt broken and that he had pain and discomfort around his neck. *Id*. ¶ 207. Defendant, however, forced Radcliff to keep working despite his obvious injuries, and only several hours later took Radcliff to the hospital for his injuries. *Id*. Over the next few days, Defendant failed to provide Radcliff with any food or nutrition which caused his condition to further deteriorate. *Id*., Pg. 38 ¶ 208. Eventually, a hospital conducted surgery on Radcliff's jaw, installing several metal plates. *Id*., Pg. 38 ¶ 208. Defendant, however, failed to inform Radcliff's family that he was injured or in the hospital. *Id*. Due to these injuries, Radcliff was not able to appear for his court date which had to be pushed back three (3) months. *Id*. Moreover, like many of the Plaintiffs and the Decedent, Defendant has a video of the incident but has not produced it to victims or their families. *Id*. Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, and systemic understaffing and overcrowding of the jail were direct and moving forces behind Radcliff's injuries. *Id*. ¶ 210.

oo. **Zachery Johnson**. *See* Related Civil Action, Doc. 1, Pg. 28-29 ¶ 143-152 / Pg. 168-159 ¶ 971-974 / Pg. 214-215 ¶ 1189-1195. On or around May 29, 2023, Defendant booked Johnson into its jail facility. *Id*., Pg. 28 ¶ 143. On or around June 6, 2023, another detainee attacked Johnson and caused him to have a red eye another bruising on his body. *Id*. ¶ 144. Defendant, however, failed to intervene in on this attack, was not properly monitoring or observing the detainees to prevent his attack, and upon information and belief, Defendant delayed in providing Johnson with sufficient and adequate medical care. *Id*. ¶ 144-145. Johnson passed out due to the inadequate medicine provided to him at the jail and was then eventually taken to the hospital. *Id*. ¶ 145. A few days later, Defendant assaulted Johnson at the jail. *Id*. ¶ 146. The severity of the assault caused Johnson to suffer seizures during the assault and go in-and-out of consciousness multiple times. *Id*. Despite suffering from severe injuries and languishing in pain, Defendant did not provide Johnson with adequate care for his injuries and forced him to remain in the general population of the jail. *Id*. ¶ 147. On June 13, 2023,

63

Johnson's family, for fear of his life, was able to get Johnson released from the jail and took him to a hospital near their home. *Id*., Pg. 29 ¶ 148. The hospital found that Johnson had suffered from a fractured skull, fractured spine, and fractured ribs. *Id*. ¶ 149. Additionally, Johnson's head injuries caused him to have blood on his brain. *Id*. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical case, systematic understaffing and overcrowding of the jail as well as the failure-to-train and the failure-to-supervise were all direct causes and moving forces behind Johnson's injuries. *Id*. ¶ 151.

pp.   **Zachary Zepeda**. *See* Related Civil Action, Doc. 1, Pg. 38-39 ¶ 212-218 / Pg. 165-166 ¶ 959-962 / Pg. 192-193 ¶ 1064-1066. Zepeda is a plaintiff in this lawsuit, and is a resident of Harris County, Texas. *Id*., Pg. 12 ¶ 31. On June 6, 2023, Defendant booked Zepeda into its jail facility, and at the time obtained notice that he had a serious medical condition which included anxiety. *Id*., Pg. 38 ¶ 212. On June 11, 2023, other detainees attacked Zepeda from behind, and punched and stomped him. *Id*. ¶ 213. The attack lasted for a considerable period of time. *Id*., Pg. 38-39 ¶ 213. Defendant, however, did not intervene into the assault and permitted the assault to end naturally before involving itself. *Id*., Pg. 39 ¶ 213. Upon information and belief, Defendant delayed in providing Zepeda with adequate and sufficient medical care. When he was taken to the hospital, they found that he had suffered from skull fractures, blood on his brain, blood on the majority of his spine, facial bruising, a broken eye socket, and a compression fracture of his spine. *Id*. ¶ 214. The hospital had to place a catheter on him to help him go to the bathroom, and Zepeda had this catheter for several weeks in the jail. *Id*. ¶ 215. When Zepeda's mother went to see him in the jail, Zepeda's head was still swollen with several scars and he was on crutches. *Id*. ¶ 216. Even while she was visiting him, one of the guards dragged Zepeda by his leg across the room for no reason. *Id*. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail as well as the failure-to-train and failure-to-supervise were direct causes and moving forces behind Zepeda's injuries. *Id*. ¶ 217.

qq.   **Ramon Thomas**. *See* Related Civil Action, Doc. 1, Pg. 21-22 ¶ 95-103 / Pg. 167-168 ¶ 967-970 / Pg. 194 ¶ 1070-1072. Plaintiff Dianne Bailey Rijsenburg is the mother and heir of Thomas, and resides in Harris County, Texas. *Id*., Pg. 12 ¶ 35. On April 19, 2023, Defendant booked Thomas into its jail facility, and at the time obtained notice of his serious medical conditions which including being bipolar and schizophrenic. *Id*., Pg. 21 ¶ 95. Due to his mental state, Thomas was extremely vulnerable to bullying and abuse, and bullied to the point where Thomas' family requested that he be placed in the mental health section of the jail. *Id*. ¶ 96. Despite

assurances that Thomas would be placed in a safe part of the jail, Defendant placed Thomas in the general population of a certain floor, a floor where several other Plaintiffs were injured or lost their lives. *Id*. ¶ 97. Although Thomas's mental disability required continuous observation and care to ensure his safety Defendant placed him on the sixth floor with lacked measures to provide sufficient observation and monitoring. *Id*. ¶ 98. On July 1, 2023, other detainees found Thomas suffering from a medical emergency. *Id*., Pg. 22 ¶ 100. The detainees called for help for several minutes without any response from the detention officers. *Id*. Eventually, Defendant responded but failed to conduct CPR or any other life saving measures. *Id*. ¶ 101. Instead of handling Thomas with care, Defendant dropped Thomas to the ground causing the landing to be heard in the adjoining rooms. *Id*. Defendant then took Thomas to the clinic, and he was later declared dead at the hospital shortly after arrival. *Id*. Defendant's failure to provide CPR and other life saving measures was consistent with what had occurred with other detainees. *Id*. In fact, it is common for Defendant to falsify when life saving measures began. *Id*. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systemic understaffing and overcrowding of the jail were direct causes and moving forces behind Tomas's injuries and death. *Id*. ¶ 102.

rr. **Bryan Johnson**. *See* Related Civil Action, Doc. 1, Pg. 15-17 ¶ 56-65 / Pg. 156 ¶ 919-922 / Pg. 183-184 ¶ 1034-1036. Plaintiff Amanda Harris is the mother and heir of Johnson, and she resides in Harris County, Texas. *Id*., Pg. 12 ¶ 23. On June 8, 2022, Defendant booked Johnson into its jail facility, and at the time obtained notice of his serious medical and mental disabilities. *Id*., Pg. 15 ¶ 56. On or around August 5, 2023, Defendant asked Johnson to leave his cell, and he did so. *Id*. ¶ 57. As Johnson walked out of his cell, Defendant pushed Johnson to the ground and began viciously beating him for several minutes. *Id*. Despite the injuries Johnson suffered, Defendant did not take Johnson to the clinic immediately; and instead, placed him in the floor's holding cell. *Id*., Pg. 16 ¶ 58. After being in the cell for several hours, Defendant returned and beat Johnson for a second time. *Id*. After which, Defendant did not take Johnson to the clinic until a couple of days later. *Id*. There, the clinic did only cursory evaluation and noted that Johnson had injuries to his wrists from handcuffs, facial bruising, and injuries to his right leg. *Id*. Around September 9, 2023, Johnson began to have trouble breathing due to the injuries he had suffered, and was eventually prescribed an inhaler which was to be kept on him at all times. *Id*. ¶ 60. Unfortunately, in retaliation, Defendant took his inhaler from him and then returned it empty. *Id*. Besides providing the empty inhaler, Defendant did not provide sufficient diagnostic testing that should have been ordered for someone in Johnson's position. *Id*. Had the Defendant conducted sufficient testing, Defendant would have notices that Johnson's condition was worsening and that he was having an onset of lung and heart

conditions. *Id*. ¶ 61. A week prior to his death, Johnson requested emergency medical assistance for his trouble breathing on the medical kiosk. *Id* ¶ 62. However, Defendant did not respond to his requests and did not provide him any medical evaluation. *Id*. Thereafter, on October 1, 2023, Johnson's breathing became worse, and he had another detainee request medical assistance. *Id*. ¶ 63. By the time Defendant got around to arriving, Johnson could no longer function. *Id*. Defendant then took Johnson to the clinic where he became unresponsive while waiting for care. *Id*. Then, Johnson passed away later that day. *Id*. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systematic understaffing and overcrowding of the jail were the direct cause and moving forces behind Johnson's injuries and death. *Id*., Pg. 17 ¶ 64.

ss.    **Alfred Rios**. Rios had been in Defendant's custody since at least March 2021 which amounts to approximately two (2) year for only a mere misdemeanor charge. In or around September 2023, Rios had a medical emergency while in Defendant's custody at its jail. Upon information and belief, Defendant failed to properly monitor its detainees and conduct proper face-to-face observations. As such, Defendant unreasonably delayed in providing Rios with timely, sufficient, and adequate medical care. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systematic understaffing and overcrowding of the jail were the direct cause and moving forces behind Rios' injuries and death.

tt.    **Kenneth McZeal**. McZeal had been in Defendant's custody since June 8, 2021. During his stay, Defendant knew that McZeal had a terminal illness. Yet, upon information and belief, Defendant failed to provide timely and adequate medical care to McZeal during his stay in Defendant's jail facility. Upon information and belief, Defendant failed to properly monitor its detainees and conduct proper face-to-face observations. As such, Defendant unreasonably delayed in providing McZeal with timely, sufficient, and adequate medical care. As a result, on or around October 9, 2023, McZeal died. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systematic understaffing and overcrowding of the jail were the direct cause and moving forces behind McZeal's injuries and death.

uu.    **Dominga Treviño Barrera**. Defendant booked Barrera into its jail facility and was awaiting trial since June 29, 2023. Before that, she was arrested at a hospital while she was receiving treatment for a serious medical condition. Upon her booking, Defendant knew that she had serious medical and mental health conditions. Defendant, however, failed to adequately provide Barrea with the medication attention that she required. Moreover, upon

66

information and belief, Defendant failed to properly monitor its detainees and conduct proper face-to-face observations. As such, Defendant unreasonably delayed in providing Barrera with timely, sufficient, and adequate medical care. As a result, on October 27, 2023, Defendant died. Hence, Defendant's prevalent policies, practices, and customs of failing to observe and monitor detainees, provide timely and adequate medical care, and systematic understaffing and overcrowding of the jail were the direct cause and moving forces behind Barrera's injuries and death.

Hence, Plaintiff and the Decedent have valid conditions of confinement claims, and is here pursuing them against the Defendant.

### COUNT 2 – FAILURE TO SUPERVISE

70. Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

71. In the Fifth Circuit the elements for a failure-to-supervise claim are (1) the sheriff in his official capacity failed to supervise, (2) a causal connection between that failure-to-supervise and the violation of the plaintiff's rights, and (3) such failure to supervise or train amounted to gross negligence or deliberate indifference. *Doe v. Taylor Indep. School Dist.*, 15 F.3d 443, 452 (5th Cir. 1994). To that end, the Fifth Circuit has never required that a supervisory official be warned of the precise act that the subordinate official subsequently commits, rather, all that the Fifth Circuit (and the Supreme Court) requires is that supervisory officials just be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists. *Smith v. Brenoettsy*, 158 F.3d 908, 912 (5th Cir. 1998). Here, first, the Defendant failure to supervise its officers to ensure that they (a) properly observed and monitored the prisoners, (b) provided sufficient/adequate/timely medical care to inmates, and (c) did not bring drugs into the facility.

72. Second, there is a causal connection between those failures-to-supervise and the violation of the plaintiff's rights. In this regard, liability of the county here depends upon if it should have been obvious to the Sherriff— or stated differently, whether Defendant's Sherriff had

67

sufficient notice— that the failure to supervise the Defendants was likely to lead to a constitutional violation. *Compare Brown v. Bryan County*, 219 F.3d 459, 460 (5th Cir. 2000). To which, two things may be of importance. The first is whether it should have been obvious to the Defendant that the highly predictable consequence of not supervising its jail staff would lead to the violation of pre-trial detainee's constitutional rights, and the second is that this failure to supervise was a "moving force" with a causal connection to the constitutional injury. *Brown*, 462 (5th Cir. 2000).

73.     Here, the rights at issue are a pre-trial detainees' rights under the Due Process Clause of the Fourteenth Amendment to "basic human needs, including medical care and protection from harm" met. *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.). As explained elsewhere, when the state takes a person into custody and holds him there against his will, the Constitution imposes upon the state several corresponding duties including the duty to assume some responsibility for his safety and general well-being. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). And, here, it should have been obvious to the Sheriff that the highly predictable consequence of not supervising its jail staff to ensure that they properly observed/monitored the prisons, provided sufficient/adequate/timely medical care to inmates, and did not bring drugs into the facility would have led to the injuries suffered by the Decedent.

74.     Third, Defendant's actions and inactions amounted to deliberate indifference. Here, Defendant knew about its failure-to-supervise "infractions, but did nothing to correct them." *Compare to Tuttle v. Sepolio*, 2023 U.S. App. LEXIS 12834 *11 (5th Cir. 2023) (finding that multiple instances of the same sort of conduct permitted a failure-to-supervise claim to proceed forward). As detailed elsewhere in the Complaint, Defendant had full knowledge of the civil rights violations occurring in the county jail obtained from numerous sources; namely, from a DOJ Report, several TCJS Reports, other lawsuits, settlements, and the public statements of its own

68

policy makers (*i.e.*, the Sheriff). Moreover, as further detailed elsewhere in the Complaint, there were several incidents preceding that of the Decedent where other jail inmates suffered a violation of their civil rights as a consequence of being denied medical care for their serious medical needs. And, finally, as also explained in the Complaint, the deliberate indifferent disposition of Defendant can also be shown via subsequent incidents and repeated TCJS Reports noting its continued failures to have its employees meet the basic human medical needs of the detainees.

### COUNT 3 – FAILURE TO TRAIN

75.     Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

76.     A county can be held liable when its failure to adequately train officers results in violations of constitutional rights. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *133-134 (S.D. Tex. 2018). To establish such a failure to train claim, a plaintiff need only show that (1) the county failed to train the officers involved, (2) there is a causal connection between the alleged failure to train and the alleged violation of the plaintiff's rights, and (3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights. *Id*. at *134.

77.     Here, Defendant failed to train its officers on numerous levels. First, the Defendant failed to train its supervisors with regards to the minimum standards for running a jail. Among those include training its supervisory officials regarding the requirement to have an appropriate number of jailers at the facility twenty-four (24) hours each day, how many jailers were required on each floor at all times, and to have an established procedure for documented, face-to-face observation of all inmates by jailers no less than once every sixty (60) minutes. Moreover, Defendant failed to train its guards in how to properly conduct and document face-to-face observations of all inmates, to identify when pre-trial detainees had serious medical needs that

required attention, and how to conduct contraband searches to ensure that drugs would not enter the facility without authorization. Second, Defendant also failed to train its licensed physicians, professionals, allied health personnel, hospital, or similar services in the minimum requirements for a jail in Texas. Among those included the need for regularly scheduled sick calls, how to provide referrals, procedures for efficient and prompt care for acute and emergency situations, procedures for distributions of prescriptions, procedures for distribution of over-the-counter medications, procedures for all examinations, treatments and other procedures to be provided in a dignified manner, how to use first aid equipment, properly evaluate patients, review inmate prescriptions, and how to provide inmates with access to medical care. Third, Defendant failed to train its employees on how to spot drug overdoses and what to do when finding such situations. Fourth, approximately one year after Decedent's incident, in a written report dated March 8, 2023, the TCJS found that several jail officers who were supposed to have received suicide prevention training had not received that training, in accordance with jail policies. *Id.*, Pg. 78 at ¶ 418.

78. Additionally, there is a causal connection between those failures-to-train and the violation of the Decedent's civil and constitutional rights. Again, the rights at issue are a pre-trial detainees' rights under the Due Process Clause of the Fourteenth Amendment to receive provision of "basic human needs, including medical care and protection from harm" met. *Wynn v. Harris Cty.*, 556 F. Supp. 3d 645, 655 (S.D. Tex. 2021) (Ellison, K.). As explained further elsewhere in this petition, when the government takes a person into custody and holds him there against his will, the U.S. Constitution imposes upon the government corresponding duties to assume some responsibility for his safety and general well-being. *Helling v. McKinney*, 509 U.S. 25, 31 (1993). Here, by failing to train its employees in the basic requirements for running a jail in Texas, the Decedent was denied his basic human needs which included access to medical care for his gut-

70

wrenching abdominal pain. Furthermore, the Decedent was not protected from the harm of the introduction of unauthorized drugs into the facility which could help ease his untreated pain, but expose him to great bodily harm and death.

79.    Furthermore, all of this constituted a deliberate indifference in two ways; to wit:  1) the Defendant was repeatedly put on notice of the same constitutional violations in the jail through DOJ Reports, TCJS Reports, lawsuits, settlements, and public discussion showing that its own policymakers (*i.e*., its Sheriff and others) were on notice of these problems, yet failed to act or properly address the continued violations; 2) there is a clear pattern of similar incidents here, established in the historical record.  It is well known that for purposes of failure-to-train claims, a showing of deliberate indifference would require only "a pattern of *similar* constitutional violations by untrained employees, rather than exact duplication." *Parker v. LeBlanc*, 73 F.4th 400, 406 (5th Cir. 2023) (internal quotations omitted). Here, however, it is clear that Plaintiff has pled a pattern of extremely similar and repetitive constitutional violations where the Defendant has deprived its jail detainees of their basic human needs, which obviously includes access to adequate medical care.

**COUNT 4 – EPISODIC ACTS**

80.    Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

81.    In an abundance of caution, Plaintiff also brings this episodic act cause of action in the alternative. *See* Fed. R. Civ. P. 8(d). To establish county liability under an episodic acts theory, a plaintiff need only show that: (1) a county employee violated the decedent's constitutional rights with subjective deliberate indifference, and (2) the violation resulted from a county policy or custom adopted or maintained with objective deliberate indifference. *Salcido v. Harris Cty.*, 2018

U.S. Dist. LEXIS 169034 *127 (S.D. Tex. 2018).  Here, first, upon information and belief, at least one of Defendant's employees violated the Decedent's constitutional rights with subjective deliberate indifference.  That constitutional right was a pretrial detainee's right to not have his serious medical needs met with deliberate indifference.  *Supra*.  Second, the violation resulted from the Defendant's above-described policies or customs which were maintained with objective deliberate indifference.

82.    Upon the second, a plaintiff needs only show (a) an official policy or custom (b) of the county's policymaker (c) that caused (d) the deprivation of a constitutionally protected right. *Salcido v. Harris Cty.*, 2018 U.S. Dist. LEXIS 169034 *130 (S.D. Tex. 2018).  First, the relevant policies are described above.  *Supra*.  In brief, they include the Defendant's custom, policy or practice of failing to properly observe/monitor the inmates, failing to provide adequate/sufficient/timely medical care, systematic understaffing/overcrowding, and disparate staff scrutiny/security screenings.  *Supra*.  Second, the Defendant's policymaker is the Sherriff and the Commissioner's Court.  *Supra*.  Third, their policies, fourth, caused the deprivation of the Decedent's constitutional protected right.  *Supra*.  Again, that constitutional right was a pretrial detainee's right to not have his serious medical needs met with deliberate indifference.  *Supra*.

## COUNT 5 – SURVIVORSHIP

83.    Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

84.    The remedies provided by § 1983 would fail if a decedent's cause of action did not survive his or her death.  *DePaz Gonzalez v. Duane*, 858 Fed. Appx. 734, 737 (5th Cir. 2021) (finding that a decedent's parents in Texas could bring a survivorship action).  As background, in Texas, a cause of action for personal injury to the health, reputation, or person of an injured person

does not abate because of the death of the injured person. *See* Tex. Civ. Prac. & Rem. Code § 71.021(a). Indeed, a personal injury action survives to and in favor of the heirs, legal representatives, and of the injured person. *Jackson v. City of Houston*, 2023 U.S. Dist. LEXIS 192169 *13 (S.D. Tex. 2023) (citing Tex. Civ. Prac. & Rem. Code § 71.021(b)).

85.    An "heir" is a person who is entitled under the statutes of descent and distribution to a part of the estate of a decedent who dies intestate. *See* Tex. Est. Code § 22.015. If a decedent who dies intestate and has no children, the decedent's estate descends to his parents. *Id*. § 201.001. Thus, here, since the Decedent died and has no children, the Plaintiff (i.e., his mother, heir and legal representative) is permitted by law to proceed as if the Decedent had lived against the Defendant since there is no administration of the Decedent's estate pending and none is necessary.

## COUNT 6 – WRONGFUL DEATH

86.    Plaintiff incorporates the foregoing paragraphs as if set forth fully herein.

87.    Texas Civil Practice and Remedies Code § 71.004(a) provides for a wrongful death cause of action for "the surviving spouse, children, and parents of the deceased." *DePaz Gonzalez v. Duane*, 858 Fed. Appx. 734, 737 (5th Cir. 2021) (finding that, as incorporated through § 1988, civil rights plaintiffs in Texas may recover for their own injuries and the injuries of the deceased persons resulting from the constitutional violations of government actors if the plaintiffs are surviving parents, heirs, legal representatives, or estate of the deceased).

88.    A plaintiff seeking to recover on a wrongful death claim under § 1983 need only show that the alleged constitutional deprivation required by § 1983 and the causal link between the defendant's unconstitutional acts or omissions and the death of the victim, as required by the state's wrongful death statute. *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 882 (5th Cir. 2016) (finding conditions of confinement claim wrongful death claim was should not have been

dismissed).  Here, the Plaintiff is the decedent's mother, and therefore is a statutory beneficiary of the decedent who may bring a wrongful death cause of action.  *See* Tex. Civ. Prac. & Rem. Code § 71.004.  Adding further, the defendant's wrongful acts caused the death of the decedent.  *Supra*.  Moreover, the Decedent would have been entitled to bring an action for his injuries had the lived.  Finally, the Plaintiff has suffered an actual injury by and through the loss of her son, the Decedent.

89.     This claim is brought pursuant to the Supplemental Jurisdiction statute, 28 U.S.C. § 1367.

## VII.     ADOPTION BY REFERENCE OF RELATED CIVIL ACTION

90.     Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

91.     Out of abundance of caution, the Plaintiff hereby adopts by reference the statements made in the pleadings of the Related Civil Action, for purposes of brevity and completeness, to the extent applicable to this action. Fed. R. Civ. P. 10(c) ("A statement in a pleading may be adopted by reference elsewhere in the same pleading or in any other pleading or motion").

## VIII.   ATTORNEY'S FEES

92.     Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

93.     Pursuant to 42 U.S.C. § 1988; 42 U.S.C. § 12205; and 29 U.S.C. § 794a, the Plaintiff is entitled to recover their attorney's fees and costs.

## IX.     JURY REQUEST

94.     Plaintiff respectfully requests a trial by a jury of their peers on all matters triable to a jury. Plaintiff will tender the appropriate fee.

//

## X.    DAMAGES

95.    Plaintiff incorporates the foregoing and succeeding paragraphs as if set forth fully herein.

96.    Plaintiff suffered the following damages as a direct and proximate result of Defendant's violations as identified above:

a.    Actual compensatory damages;

b.    Medical expenses incurred in the past;

c.    Funeral and burial expenses;

d.    Mental anguish and emotional distress suffered by the Decedent;

e.    Mental anguish and emotional distress suffered by the Plaintiff;

f.    Lost earnings capacity;

g.    Lost care, guidance, love, affection, or counsel;

h.    Lost household services;

i.    Lost inheritance;

j.    Pain and suffering by the Decedent;

k.    Loss of enjoyment of life;

l.    Violations of constitutional rights;

m.    Pre-judgment interest;

n.    Post-judgment interest; and

o.    Reasonable and necessary attorneys' fees incurred.

## XI.    PRAYER

For all the foregoing reasons, Plaintiff Ana Garcia prays for judgment against the Defendant, as follows:

a. compensatory, and special damages, as noted above;

b. the cost of this action and reasonable attorneys' fees as provided by 42 U.S.C. §1988;

c. pre-judgment and post-judgment interest;

d. trial by jury; and

e. such other and further relief, at law and in equity, that the Honorable Court deems just and equitable.

Respectfully submitted,

**THE SHARIFF LAW FIRM**

By: _____

**M. Obaid Shariff**
Federal I.D. No. 2827312
Texas Bar No. 24091135
mshariff@sharifflawfirm.com
**Kevin Acevedo**
Federal ID No. 2932922
Texas Bar No. 24086848
kacevedo@sharifflawfirm.com

2500 West Loop South, Suite 300
Houston, Texas 77027
(713) 244-8392 (Telephone)
(713) 244-8372 (Fax)
**ELECTRONIC SERVICE VIA:**
eservice@sharifflawfirm.com

**ATTORNEYS FOR PLAINTIFF ANA GARCIA**